**George Jerome PFEIFER, Petitioner,**

v.

**UNITED STATES BUREAU OF PRISONS, Respondent.**

**Civ. No. 78–352–GT.**

United States District Court,
S. D. California.

Jan. 29, 1979.

George Jerome Pfeifer, pro se.

Earl Kaplan, Dept. of Justice, Washington, D. C., Bruce R. Castetter, Asst. U. S. Atty., San Diego, Cal., for respondent.

## ORDER

GORDON THOMPSON, Jr., District Judge.

In this habeas corpus proceeding pursuant to 28 U.S.C. § 2241 (1976), the petitioner Pfeifer seeks release from the federal penitentiary where he is serving the remainder of a sentence originally imposed by Mexican officials in a Mexican court for a Mexican crime. Pfeifer's claim challenges the constitutionality of the Treaty on the Execution of Penal Sentences, Nov. 25, 1976, United States-Mexico, T.I.A.S. No. 8718 (the Treaty) and the constitutionality of the Treaty's implementing legislation, 18 U.S.C.A. §§ 4100–4115 (Supp.1978). Pfeifer is proceeding on his own behalf and *in forma pauperis.* The petition is denied.

## I

Pfeifer and the government do not dispute most of the facts. On the evening of September 19, 1977, Pfeifer arrived in Mexico City on a flight from Bogota, Colombia.

Mexican officials[1] searched his luggage and found a can of powder that they claimed was cocaine. They also found United States currency on Pfeifer, allegedly including three counterfeit American one hundred dollar bills.[2]

Pfeifer claims, and the government does not deny, that after his arrest, "I was beaten by five Mexican agents and tortured with electric cattle prods and half/drowned [*sic*] with carbonated water and forced to sign a confession which I was not allowed to read." Petition for Writ of Habeas Corpus at 4. He also states that a "Mexican Official . . . put his automatic pistol to my head while at the same time [an American present in the room] opened his jacket up so I could see his pistol. The Mexican Official then pulled the hammer back on his pistol and again ordered me to sign [a confession]. I did." Affidavit of George Jerome Pfeifer (October 21, 1978) (filed October 27, 1978). On March 31, 1978, a Mexican court in Mexico City found Pfeifer guilty of the two charges against him. The court sentenced him to seven years' imprisonment for the importation of cocaine and five years in prison for possession of counterfeit money, the sentences to run consecutively from September 22, 1977.

Pursuant to the procedures outlined in 18 U.S.C.A. §§ 4100–4115 (Supp.1978), Pfeifer had a hearing before United States Magistrate J. Edward Harris in Tijuana, Mexico, on May 12, 1978. Prior to this hearing, Pfeifer met with appointed counsel and was given a booklet published by the United States Department of Justice that contained questions and answers regarding the Treaty's operation. At the end of the hearing, Pfeifer, who was under oath, and Magistrate Harris signed a Consent Verification Form, stating, among other things, that Pfeifer consented to his transfer to the United States for the execution of the sentence imposed by the Mexican court, that the conviction could only be modified or set aside through appropriate proceedings brought in Mexico, that his sentence would be carried out according to the laws of the United States of America and that those laws were subject to change, and that the consent was wholly voluntary and not the result of promises, threats, coercion, or other improper inducements.

Pfeifer was sent to the Metropolitan Correctional Center in San Diego. On June 2, 1978, he filed this petition for a writ of habeas corpus. Eleven days later he was transferred to the Federal Correctional Institute in Lompoc, California.[3] At a subsequent parole hearing, he was given a presumptive parole date of September 22, 1981. *See* Exh. C., Opposition and Response. In this action, Pfeifer contends (1) that his custody in the United States for crimes committed in Mexico is unconstitutional, (2) that his conviction was obtained by use of a coerced confession, (3) that he was denied assistance of counsel during trial, and (4) that he was denied his "right of appeal" from the conviction.

## II

### CONSTITUTIONAL CLAIM

Pfeifer agrees that the transfer of prisoners to their native countries is a proper subject of the treaty power. *See* Traverse to the Return at 3–5. He does not contend that the Constitution operated extraterritorially to protect him. Rather, he argues that the custody of an American citizen for service of a sentence imposed in culmina-

---

1. The government states that Mexican customs inspectors arrested Pfeifer. *See* Opposition and Response to Petition for Relief at 2. Pfeifer alleges that Mexican federal police arrested him. *See* Traverse to the Return at 2.

2. According to the government, Pfeifer was carrying two passports and two credit cards in the names of George Jerome Pfeifer and Roy Lee Hampton. Pfeifer claimed the passport in the name of Pfeifer was legal and that he used the other name "to avoid problems" when he left the United States. *See* Opposition and Response at 3.

3. Although Pfeifer is no longer within the Southern District of California, this court still has jurisdiction over him, because, at the time the petition was filed, it had jurisdiction over both him and his custodian. *See* Smith v. Campbell, 450 F.2d 829 (9th Cir. 1971).

tion of an unfair foreign trial is a governmental involvement that the Constitution does not tolerate.[4]  On the premise that his Mexican trial was unfair in the respects charged in this case, Pfeifer lays claim to judicial process to right the asserted constitutional violation.

For the reasons stated in *Holmes v. Laird*, 148 U.S.App.D.C. 187, 459 F.2d 1211, *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972), however, Pfeifer's allegations do not entitle him to release.  In *Holmes*, American servicemen were tried in a West German court for the rape of a West German woman on West German soil. They were denied a speedy trial, an attorney of their choice, and a fair appeal.  The representation afforded them was ineffective, and they were not permitted to confront the witnesses against them.  Shortly before a West German appellate court affirmed their convictions, the servicemen left West Germany without authorization and returned to the United States, where they surrendered to Army officials.  Under the terms of the Supplementary Agreement to the NATO Status of Forces Agreement (SOFA), Aug. 3, 1959, 14 U.S.T. 531, T.I. A.S. No. 5351, the Army was obliged to turn these men over to the West German government to serve their sentences.  Before the Army could do so, the servicemen brought suit in a federal court to enjoin their impending return to West Germany.

There, as here, the court assumed that the trial failed to comply with the Bill of Rights.  There, as here, the plaintiffs maintained that they could not be forced to serve sentences imposed after their "unconstitutional" trial.  Yet the court concluded that the Constitution did not prevent the United States from complying with its treaty commitments.

> The Constitution plays no part in this case unless somehow it operates to negate those commitments in the circumstances appellants allege.

It is evident that if appellants' point were to be entertained, an in-depth examination of the West German trial record would become an indispensable forerunner of any endeavor to resolve their claims on the merits.  We need not pause to reflect on the difficulties—practical or otherwise—of such an undertaking, for appellants' contention that the Constitution has the effect asserted is doomed, we think, by the Supreme Court's holding in *Neely v. Henkel*, [180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901)].  An American citizen there contended that a federal statute authorizing extradition compliably with an applicable treaty to a foreign country or territory occupied by or under the control of the United States was "unconstitutional and void in that it does not secure to the accused, when surrendered to a foreign country for trial in its tribunals, all of the rights, privileges, and immunities that are guaranteed by the Constitution to persons charged with the commission in this country of crime against the United States."  Reference, in support of this position, was made not only to particular provisions of the Constitution but also "generally to the fundamental guaranties of life, liberty, and property embodied in that instrument." The Court found the argument wanting:

> The answer to this suggestion is that those provisions have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country.

> In connection with the above proposition, we are reminded of the fact that the appellant is a citizen of the United States.  But such citizenship does not give him an immunity to commit crime in other countries, nor entitle him to demand, of right, a trial in any other mode than that allowed to its own people by the country whose laws he has violated and from whose justice he has fled.  When an American citizen commits a crime in a foreign country, he

---

**4.**  Pfeifer apparently measures fairness by the American Constitution, rather than by the laws of Mexico.

cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States.

As we view *Neely*, it governs the decision on the point under discussion. What we learn from *Neely* is that a surrender of an American citizen required by treaty for purposes of a foreign criminal proceeding is unimpaired by an absence in the foreign judicial system of safeguards in all respects equivalent to those constitutionally enjoined upon American trials. We do not believe that that teaching has been eroded by time, nor that the slight factual differences between the pretrial extradition there and the postconviction surrender here removes the instant situation from *Neely's* ambit. We conclude, then, that the Constitution erects no barrier to appellants' surrender to the Federal Republic in conformity with NATO SOFA and the Supplementary Agreement.

148 U.S.App.D.C. at 194–195, 459 F.2d at 1217–19 (footnotes omitted). *See also Wilson v. Girard*, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957) (upholding delivery of American to Japan for trial not complying with American Constitution).

■■■ America is not vicariously liable for the acts of another nation. Consequently, as in *Holmes*, the fifth amendment permits the United States to enforce the sentences meted out by foreign courts, even if those sentences were "unconstitutionally" procured. American custody of convicts originally tried and imprisoned in Mexico, as in Pfeifer's case, is simply another form of enforcing a foreign sentence. Therefore, the Treaty does not run afoul of the Constitution, simply because it provides for the incarceration in the United States of American citizens whose foreign trials did not comply with the Bill of Rights.

■■ Pfeifer's constitutional claim does present one issue not present in *Holmes*. In that case the entire trial apparently occurred without American involvement. Here, Pfeifer alleges that "an American" was present in the room where he was interrogated. Pfeifer states this American "opened his jacket up so as I could see his pistol" when a Mexican official put a gun to Pfeifer's head and demanded a confession.[5] Recently, the Ninth Circuit held that foreign authorities must abide by American rules of constitutional criminal procedure in questioning Americans on foreign soil, if those authorities and agents of the United States are engaged in a "joint venture" in apprehending the Americans. *See United States v. Emery*, 591 F.2d 1266 (9th Cir. 1978). Unlike Pfeifer's case, however, *Emery* involved trial by an American court for an American crime. *See Brulay v. United States*, 383 F.2d 345, 349 n.5 (9th Cir. 1967) ("joint venture" doctrine as limit on American trials).

Moreover, even if the "joint venture" analysis applies in determining whether Pfeifer has a constitutional claim based upon his foreign conviction, the facts do not indicate any joint venture between American and Mexican officials. There is no evidence the "American" present at Pfeifer's interrogation instigated the questioning or took any part in it, nor was the "American" an agent of the United States, nor does Pfeifer allege any American participation in his arrest or trial. *See United States v. Trenary*, 473 F.2d 680 (9th Cir. 1973) (no joint venture where American customs officer served as interpreter in getting incriminating statements); *United States v. Stonehill*, 405 F.2d 738 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969) (American helped search but did not plan raid).

### III

### TREATY AND STATUTORY CLAIM

■■ In his Traverse, Pfeifer raises as a separate question the government's compli-

---

**5.** Pfeifer's Traverse to the Return at 8 stated that "I personally was forced to sign a typewritten confession at gun-point with both a Mexican agent and an American DEA agent having guns." His subsequent affidavit backed off considerably from this broad assertion.

ance with the Treaty and the Treaty's implementing legislation. Under the Treaty, art. IV(2), and 18 U.S.C.A. § 4100(b) (Supp. 1978), a prisoner must consent to his transfer. Pfeifer now charges that he did not consent knowingly and voluntarily. Even if failure to comply with part of the Treaty entitles Pfeifer to habeas relief, *but see Holmes v. Laird*, 148 U.S.App.D.C. 187, 195–201, 459 F.2d 1211, 1219–25, *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972), and even if consent must be knowing and intelligent within the constitutional guidelines of *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) and *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the record in this case does not support Pfeifer's allegations.

At the May 12 hearing in Tijuana before Magistrate Harris, Pfeifer signed a Consent Verification Form. That form stated, "I hereby consent to my transfer to the United States of America for execution of the penal sentence imposed on me by a court of the United Mexican States, or a state thereof." The magistrate then signed a statement saying "that the above consent was knowingly and understandingly given and is wholly voluntary and not the result of any promises, threats, coercion, or other improper inducements." Opposition and Response to Petition for Relief, Exh. B. The magistrate also made an oral finding that "this is a voluntarily made . . . transfer." Supplemental Transcript at 4. A review of the transcript of this hearing reveals that Magistrate Harris made all the inquiries required of him under 18 U.S.C.A. § 4108 (Supp.1978). Nothing in the record shows that the magistrate's finding of a voluntary consent was clearly erroneous or an abuse of discretion.

To escape the force of these statements, Pfeifer makes a number of arguments. First, he states that the magistrate "was acting out of his jurisdiction." Traverse to the Return at 6. The legislation implementing the treaty, however, gives United States magistrates the power to verify the consent of transferring prisoners. *See* 28 U.S.C.A. § 636(f) (Supp.1978). Second, Pfeifer says he acted under "the duress factor of having to stay in Mexico and be resubjected to deprivation and inhumane treatment." Traverse to the Return at 7. The threat of continued Mexican incarceration, however, is not the kind of "duress" that invalidates his consent. Rather, it is simply the option Pfeifer had to returning to the United States. Were Pfeifer's test for duress accepted, no prisoner could consent to his transfer. In any event, at the May 12 hearing, Pfeifer stated under oath that nobody had threatened him in any way to cause him to sign the Consent Verification Form. *See* Supplemental Transcript at 4.

Finally, Pfeifer claims that his consent was not knowingly and intelligently given, because he had inadequate counsel.[6] The counsel to whom he is referring is the appointed attorney with whom he met prior to the hearing on May 12. He attacks the attorney's adequacy in three ways. First, he says she was an "employee of the United States Justice Department and being so had conflicts of interests." The record does not bear out Pfeifer's assertion. His attorney was Ms. Judy Clarke, a member of the federal defenders program in San Diego and not a member of the Department of Justice. *See* Opposition and Response to Petition for Relief at 9; Affidavit of George Jerome Pfeifer (October 20, 1978) (filed October 27, 1978). Indeed, in implementing the Treaty, Congress envisioned that federal defenders, rather than members of the offices of the United States Attorneys, would be appointed as counsel in these proceedings, precisely because federal defenders are not subject to conflicting interests. *See* H.R.Rep.No.720, 95th Cong., 1st Sess. 38, *reprinted in* [1977] U.S.Code

---

**6.** Presumably the counsel provided in 18 U.S. C.A. § 4108 (Supp.1978) must be constitutionally competent counsel within the meaning of *Tollett v. Henderson*, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). *See also Cooper v. Fitzharris*, 586 F.2d 1325 (9th Cir. 1978) (on habeas review for lack of adequate counsel question is whether person accused of crime was afforded reasonably competent and effective representation).

Cong. & Admin.News, pp. 3146, 3161. Second, Pfeifer claims he was told that the May 12 hearing was "only a formality." Even if this is true, he does not explain why this statement rendered his representation inadequate, or how it prejudiced him, or why it made his consent unknowing or involuntary.

Third, Pfeifer says Ms. Clarke told him "that I would be processed in at the MCC in San Diego and that the individuals of the 2 prior groups were released shortly after their arrival home. We were all elgible [sic] for parole immediately, she said." Affidavit of George Jerome Pfeifer (October 20, 1978) (filed October 27, 1978). Apparently, Pfeifer believes that this advice was erroneous. As far as the record goes, however, Ms. Clarke was absolutely correct in what she told him. In particular, all transferring prisoners are eligible for parole. See 18 U.S.C.A. § 4106(c) (Supp.1978). If Pfeifer 'is complaining that Ms. Clarke should have told him that he might not be released immediately upon his return to the United States, that omission did not render her representation incompetent or ineffective. See Tollett v. Henderson, 411 U.S. 258, 277, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973); Cooper v. Fitzharris, 586 F.2d 1325, 1328–1330 (9th Cir. 1978). By the time Ms. Clarke met with Pfeifer, the Department of Justice apparently had provided him with a handbook on the Treaty. In simple question-and-answer format, this handbook explained that a transferring prisoner could not expect to receive parole automatically upon his return to the United States.[7] Thus, it was not "reasonably foreseeable at the time counsel . . . failed to act," see Cooper v. Fitzharris, 586 F.2d 1325, 1330 n.10 (9th Cir. 1978), that Pfeifer would not read material specifically given to him to explain the operation of the Treaty or that Pfeifer would not understand this material. Moreover, even if this omission by Ms. Clarke did render her assistance ineffective, it can hardly be prejudicial error in light of Pfeifer's statement under oath to Magistrate Harris that it did not make any difference to him when his mandatory release date was.[8] See id. at 1331–1334.

## IV

In conclusion, the United States may constitutionally take custody of Americans tried and convicted in foreign countries un-

---

7. The booklet said:

26. *Does being immediately eligible for parole in the United States mean that I can expect to be released on parole within a very short time after my transfer?*

No. It means only that you are entitled to a hearing before Parole Commission examiners who will make a recommendation to the Parole Commission as to when you should be paroled. You will be advised within 21 days of the hearing of the Parole Commission's decision. For purposes of the initial transfer under the Treaty, arrangements are being worked out with the Parole Commission to expedite both the holding of the parole hearings and the decisions by the Parole Commission. It is hoped that all parole hearings for transferring prisoners in this group can be completed within one to two months of transfer, and that each prisoner will be informed within two weeks of his hearing of the Parole Commission's decision as to the timing of his release.

Information Booklet for United States Citizens Incarcerated in Mexican Prisons Regarding the Operation of the Treaty Between the United Mexican States and the United States of America on the Execution of Penal Sentences at 9.

8. The exchange between Magistrate Harris and Pfeifer was as follows:

HARRIS: . . . . You'll also be processed at the MCC in San Diego and you'll be given your mandatory release date, whatever that may be, and then you'll probably be given a hearing concerning possible parole.

PFEIFER: How long will that be?

HARRIS: I don't know . . . under the guidelines . . . perhaps Miss Clark [sic] and some of the others have informed you concerning your mandatory release date. I don't know what that date is. How long was the length of your sentence?

PFEIFER: Twelve years. Twelve years.

HARRIS: Twelve years? . . . I don't know the mandatory release date. It may be . . . I couldn't figure it for you, but . . . does that make any difference in whether or not you . . .

PFEIFER: No, not really.

HARRIS: consent to go? I think the mandatory release dates generally are less than they are in Mexico and that's the reason why a lot of people have transferred.

Supplemental Transcript at 4–5.

der procedures that do not comport with the Bill of Rights. The record does not support a finding of a "joint venture" even if such a finding entitled Pfeifer to habeas relief. Pfeifer's transfer complied with the terms of the Treaty and its implementing legislation. Because the facts as alleged by Pfeifer do not entitle him to a writ of habeas corpus, the court need not conduct an evidentiary hearing. *See Hernandez v. Schneckloth*, 425 F.2d 89, 90–91 (9th Cir. 1970). In view of the finding that Pfeifer is not entitled to habeas relief, the court need not consider the government's further argument that Congress withdrew power from the courts to grant such relief to prisoners returned to the United States under the Treaty. *See* 28 U.S.C.A. § 2256 (Supp.1978). The petition is DENIED.