**Raymond Bayron VELEZ, Petitioner,**

v.

**W. R. NELSON, Warden, Federal Correctional Institution, Danbury, Ct., Griffin Bell, U.S. Attorney General, United States.**

**Efran Morales CABAN, Petitioner,**

v.

**W. R. NELSON, Warden, Federal Correctional Institution, Danbury, Ct., Griffin Bell, U.S. Attorney General, United States.**

**Pedro ROSADO, Petitioner,**

v.

**W. R. NELSON, Warden, Federal Correctional Institution, Danbury, Ct., Griffin Bell, U.S. Attorney General, United States.**

**Civ. Nos. B–78–260, B–78–229 and B–78–349.**

United States District Court, D. Connecticut.

July 31, 1979.

Raymond Bayron Velez, David S. Golub (appointed), Ernest Teitell, Stamford, Conn., pro hac vice, Efran Morales Caban, Andrew B. Bowman, Federal Public Defender, Steven B. Duke, Dennis E. Curtis, Yale Law School, New Haven, Conn., Eric Freedman, Robert Suomola, Law School Interns, for plaintiffs.

Richard Blumenthal, U. S. Atty., Diana Garfield, Asst. U. S. Atty., New Haven, Conn., for defendants.

## MEMORANDUM OF DECISION

DALY, District Judge.

■ Petitioners Raymond Bayron Velez, Efran Morales Caban, and Pedro Rosado, American citizens, are in the custody of the United States serving the remainder of Mexican-imposed sentences pursuant to the American-Mexican Treaty on the Execution of Penal Sentences, Nov. 25, 1976, T.I.A.S. No. 8717 (Treaty).[1] While incarcerated at F.C.I., Danbury, petitioners filed the instant actions for habeas corpus relief challenging their custody in the United States under the Treaty. Petitioners specifically contend that the intolerable conditions surrounding their arrest and confinement in Mexico effectively coerced them into consenting to transfer to this country. The government in response maintains that the duress admittedly experienced by petitioners fails to render their consent to transfer involuntary. Thus, this Court addresses the essentially factual issue of the voluntariness of petitioners' consents.[2] *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 9 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *U. S. v. Thompson,* 356 F.2d 216, 226 (2d Cir. 1965).

## II.

The following facts are virtually undisputed.[3] Petitioners Caban and Velez became acquainted while flying from New York City to Acapulco, Mexico in November of 1975. While stopping over in Mexico City, six armed men in civilian dress arrested petitioners.[4] The men did not produce an arrest warrant. Nevertheless, they detained, searched and interrogated petitioners at the Mexico City airport.[5] Caban was handcuffed and his legs bound. When, in response to questioning, he denied knowing a certain individual, an electric cattle prod was applied repeatedly to his mouth and testicles. The interrogators beat Caban with their fists and threatened to kill him.

1. The fourth original petitioner, Felix Gauthier Melendez, has died since the filing of these petitions and this Court hereby dismisses his action as moot.

   Carlos Mercado, who testified at the evidentiary hearing in this matter, was also an original petitioner. However, he subsequently withdrew his petition because he would not assume even the slightest risk of being returned to Mexico as a result of this Court's ruling.

   The remaining petitioners have been released on parole.

   This Court has consolidated petitioners' habeas petitions.

2. Although there appears to be some argument over the scope of habeas corpus review under the Treaty, this Court has jurisdiction to rule on the validity of petitioners' consents to transfer. 28 U.S.C. § 2256(4); 18 U.S.C. § 4108(b)(3).

3. With the Court's approval, the government entered into a stipulation with petitioner Velez through counsel whereby it agreed that Caban's and Rosado's testimony concerning the conditions of their interrogation and confinement would apply to Velez as well and be given the same measure of credibility. In weighing the evidence generally this Court notes that the government failed to produce any rebuttal evidence to petitioners' assertion of the intolerable conditions during their interrogation and confinement in Mexico. And, in its post-hearing findings of fact, the government does not challenge any of petitioners factual findings regarding this time period. In effect, petitioners' testimony remains uncontroverted. Moreover, this Court finds petitioners' testimony credible after carefully scrutinizing their demeanor on the stand, and applying the traditional tests of credibility.

4. Petitioner Caban departed for Acapulco with Freddie Alia DePalm, a friend, for a vacation. DePalm and Caban met petitioner Velez for the first time at the airport, awaiting departure. All three men were arrested.

5. The arresting authorities took from Caban his jewelry and cash. These items were never returned. The search did not reveal narcotics, the basis of the subsequent charge against petitioners.

Unable to extract a positive identification, they hung Caban by one arm from the ceiling for the entire day. As a result, he suffered intermittent loss of consciousness, his arm broke, and his hand ripped apart from his wrist.[6] During this time, Velez was heard screaming in a nearby room as he received similar treatment.[7] Confessions were not forthcoming, however, and the men took petitioners to an interrogation center in Mexico City known as Los Separos.

On the same day, petitioner Rosado was arrested in a similar manner after arriving in Acapulco on a direct flight from New York City.[8] The arresting men transported Rosado to Los Separos as well. There, he was shown an individual with a battered face, whom he did not know. He later learned his name was Caban. He heard constant screaming. Under these circumstances, the interrogators asked Rosado if "he was ready to tell the truth." (Tr. 52, Nov. 20, 1978). Rosado asked the nature of the information sought. In response, the interrogators beat him, ordered him to drop his pants, and applied the electric cattle prod to the lower parts of his body. Simultaneously, they put a plastic cover over Rosado's head and began to choke him. Rosado was on the verge of passing out but they continued to interrogate and beat him.[9] Petitioner maintained his innocence throughout.

6. Mercado saw Caban soon after he had been interrogated at the Mexico City airport. He offered the following description at the evidentiary hearing:

> Mr. Caban was . . . all his clothes in rags, you know, tore up—apart. He was—he had a face swell, black eyes, his hand was swelled, too, and he got—hardly could walk, so when I saw that, I say, oh, so they have not do anything to me yet, cause I was not that, you know, I was not feeling that—as he look. I wasn't looking that bad.

(Tr. 31 Nov. 21, 1978). This Court viewed Caban's wrist and found the effect of the injury still visible.

7. Caban observed Velez when he was brought out of the interrogation room. His face was swollen, he could not walk and he had no clothing on. Burns, bruises and sores covered his body. (Tr. 129 Nov. 21, 1978).

8. The arresting authorities searched Rosado's luggage and found no narcotics. They confiscated his personal possessions and never returned them.

9. At the evidentiary hearing, Rosado described the effect of the cattle prod.

> It was applied to my testicles, all around—my testicles . . . continuous, . . . they apply it, and take it off, and apply it, and take it off, apply it and take it off . . . . It was very pain, you know, it's like when you accidently stick your finger in an electric socket, you feel that pain going into your body. It was very painful. Yes, I was in pain. I was hollering in pain.

(Tr. 94, 95 Nov. 20, 1978).

And Mercado described the pain as well.

> Q During that interrogation was he applying the cattle prod to you?
> A Right. He would apply the cattle prod every time, every time he make a question, I answer it. He would find out an excuse to use it, you know. And like, I was really uptight already. I told him many times that—that why he—why he didn't ask on a specific question, because he was asking questions that—too general, you know, like, trying to get an answer of something that—that—he didn't ask specifically, you know. He say that if I knew this guys, where I knew them from, and things like that. So I could answer those answers with a no or a yes, but then he will say, "What was your implication in the crime at any time?" I didn't even know what the crime was, so I didn't have the opportunity to answer any of his questions. So 'til finally, he decided I would not talk. He didn't let me—let me go.
> Q Now, during the interrogation, to what areas of your body did he apply the cattle prod?
> A Mostly to my testicles, and sometimes to my belly button and behind my—my ears. If—for the people that doesn't know how this—how this—this sensation this give, if the electricity works in your muscle, and the muscles contract, it's very painful when it's applied to your belly, but it's more painful when it's applied to behind your ears, because that worsened your central nerve system, and you feel a pull on your whole body. And to recover from that you have to do exercise, you know, you have to stretch again, and your testicles, my testicle were pulled, like, by my belly, and I saw that I was cripple for the rest of my life, cause I—because my muscles were pulled all—because I thought I was cripple for the rest of my life, because I thought my muscles were pulled all the way out.
> Q Your testicles were pulled up under you body?
> A Right, for at least days my organs were different, you know, I was—I was very mad,

The petitioners remained confined at Los Separos for eight days. They were imprisoned in tiny cells. Cement slabs served as beds, the stench of human excretion permeated, and the food was inedible. Each day, the authorities subjected petitioners to further torture.[10]

On the eighth day, November 26, petitioners were taken to the district attorney's office in Los Separos. The prosecutor showed them individually drafted confessions which stated that they were guilty of conspiring to import and possess narcotics, and told them that signing the statements was in their best interest. Each petitioner refused and instead offered their own. At no time during the apparent arrest and subsequent interrogation and detention had the authorities appraised petitioners of the charges against them or permitted them to obtain legal counsel.

Petitioners soon found themselves being transported to Lecumberri, a Mexican prison commonly known as the "Black Castle." At Lecumberri, petitioners were crowded into small, unheated, windowless cells.[11] With the approval of the prison administration, a group of inmates known as the "Major" and his men controlled through terror the other inmates. They forced petitioners to work "faena," whereby for hours at a time, prisoners would squat and move across the prison floor wiping up the soap and water which the guards deliberately poured over them. Failure to move quickly or steadily resulted in crippling punish-

because I couldn't answer a question, you know, because I didn't know what he want from me, so—and I was not willing to say something that will incriminate myself either, and that was what he was aiming at. (Tr. 29, 30 Nov. 21, 1978).
Caban saw Rosado at Los Separos after the torture session. He had burns on his stomach, legs and testicles, and black and blue bruises all over his body. Rosado also suffered a broken toe as a result of the torture.

10. Petitioner Caban testified that "[i]t was better to be dead than receive all that punishment." (Tr. 93 Nov. 21, 1978).

11. In December, Miguel R. Calderone, an attorney in Puerto Rico, visited Mercado at Lecumberri at the request of Mercado's parents who were clients of Calderone. He was horrified by the conditions of confinement:
Q  Just going back to the conditions at Lecumberri for just a moment. I asked you to describe the smell. What did you see? What did Lecumberri look like in terms of the floors, the conditions, toilet facilities?
A  [t]he privileged few who have a place to be sheltered in a cell, they have to fight the rats there as big as grown cats, they come out of the holes. The only privacy they have is a little cloth hanging between the entrance and in the back. The mattress which you have to buy is like a piece of rag. It is thrown on the floor. They have built with wood and a couple of bricks something to lift them off the floor. There's no heat at all, no heater. And the winter there gets very cold. No clothes. The people had the sore legs, the sores on the legs. The raggedy clothes. One was dressed one way than the other. One—we'll see somebody walk by with a black eye, the other one with—it was very—

Q  What tier were these petitioners on? On the ground or were they up above?
A  Second story.
Q  And if you didn't sleep in a cell where did you sleep?
A  You sleep in the cell or you sleep tied to the bars on the rods that are available there, because the water flows in the center court. The dirt that accumulates there, until they clean it, and some people tie themselves to the chest from the bars so when they fall asleep in the yard they don't fall on the floor.
Q  Do they have a name for these people?
A  The fahena, or the guys that are outside, these are the people that are unable to pay for a cell, they sleep outside.
Q  Was there any sanitation?
A  No. You could see the dirt, the black water accumulating in ponds and everywhere, and the cockroaches roam freely inside and outside of the cells.
Q  Did the toilets work?
A  They work. Some did work. The one that I used work.
Q  In this black water, do you know what was in it?
A  No. It was very dark, smelly water, back and forth around the area of the courtyards and the area that connected the doors to the outside.
Q  Was it near their cell where they were?
A  Yes.
Q  What was the inside of their cell like on the floor?
A  Like I say, it was very small, that long, and two mattresses, very thin mattress laying on the wooden thing that they had made with bricks, one on each side, and racks that they used there for blanket, or a rack for this and that.
(Tr. 32, 33, 34 Sept. 1, 1978).

ment.[12]  In addition, they required petitioners to pay large sums for the basic necessities including food, clothing, and cell space, and to escape "faena."  Every day, the Major's men would beat openly those inmates who were unable to make the requisite payments.  Petitioners obtained large sums of money from their families to meet the weekly payment schedule.[13]

In December of 1975, after nearly one month at Lecumberri, petitioners for the first time were notified of the formal charges against them.[14]  The guards brought petitioners to "los hugados," where a Judge's secretary, amidst a noisy and chaotic setting, advised them that they were charged formally with conspiring to import cocaine.  Petitioners, unable financially to afford the exorbitant fees requested by local counsel, denied the charges on their own behalf.[15]  The proceeding lasted approximately ten minutes and was not recorded.

12. A  Yeah the "faena" is a really hard job to do . . . you get a rag, with this rag you have to dry the floors of a yard.  The yard could be about 100–150 feet long, and they will wet it where it flows—you know, everywhere it will be really wet, and you have to kneel down, and start drying that—that sections.  You are with 25 other guys probably, and somebody is in charge of not letting you stand up or raise yourself up in another position other than that kneeling.  So you have to be moving all the time fast, and moving your rag, and so people stand on your fingers, and they push you and you slip, you hit yourself with—with everything, because everybody is in a hurry, so this guy won't hit you with his stick, or do some other harm to you.
As soon as you finished on the other side, you have to squeeze the water from this rag, and assume this position again and start back.  This go back and forth, back and forth for about 45 minutes until the floor is dry and shiny.  I was doing this for—for a period of time, and afterwards I spent about a month to recover of the—of the cramps in my legs, and the sore in my legs.
Q  Did people that had to do this kind of work for extended periods of time—did the work have an effect on their physical condition, a permanent effect?
A  Sure.  When you're in "faena" you supposed to be working for a period of three months at least.  You work three hours on and three hours off.  Doesn't matter what time, if it's 3 o'clock in the morning, you are wakened, you are provided with the equipment, and you're going to hit that yard, and do it.  After three hours you go to sleep three hours.  They don't provide you time for taking a shower.  They will bring the food in a pail, and everybody have to eat out of that pail with your hands.  They will not provide you with anything to—spoons or whatever.  They would provide you with a glass or something to take the coffee, and they will provide you with orange so you will not get to—to—in too bad shape.
This—so you can't hardly eat while you're working, you will receive a punishment when you cannot do it in the hands of another inmate.  They will kick you, they will beat you.  If you are a guy that—that—that refuse to work, you know, then you will be a cripple pretty soon, because they stick to certain area of your body.  If it is the knees or your hands or whatever, they will hit you there.  Every time you refuse, everytime they will hit you in that same place.  So these people at the end are cripples.  You know . . . . .

(Tr. 34, 35, 36 Nov. 21, 1978).

13. Money was the *sina qua non* of life at Lecumberri.  The prison sarcastically was labeled the most expensive motel in town.  Petitioners initially paid two thousand dollars each for their cells.
Attorney Calderone had to pay to gain admittance.  He testified: "They were selling electricity, they were selling showers, they were selling everything, food, everyday use things."  (Tr. at 67 Nov. 21, 1978).
Some of the money was sent to petitioners through the American embassy; other funds came directly to the warden's office.

14. A representative of the American Embassy had visited petitioners at Los Separos and indicated the probable charges against them.  She also asked them to draft a statement concerning their treatment by the Mexican authorities.  However, the official indicated that she was powerless to affect the situation.  (Tr. 88 Nov. 20, 1978) (Exh. 3).

15. Some controversy emerged at the evidentiary hearing concerning whether petitioners actually had hired an attorney.  Petitioners credibly testified that they had contacted an attorney but that he never had submitted any papers on their behalf or represented them at the various proceedings in "los hugados."  Calderone, who could not practice law in Mexico, attempted to obtain representation for petitioners but was told that "you get a certain amount of money and I will get them out of here in a week."  (Tr. 25 Sept. 1, 1978.)  However, the amounts requested fluctuated between ten thousand and two hundred thousand dollars.

The following month, petitioners attended a second proceeding at "los hugados." There, the same law secretary read from a document which appeared to be analogous to an indictment. The law secretary offered Caban assistance regarding the charges in return for payment, but Caban refused. In addition, the presiding prosecutor presented for petitioners' ratification falsely signed versions of the confessions that petitioners had refused previously to sign at Los Separos. Each petitioner disclaimed the confession and signed the charges as required to preserve their appellate rights.

Two weeks later, the authorities brought petitioners to "los hugados," on a third occasion allegedly for the purpose of trial. However, no judge or jury was present. The law secretary merely read the charges and asked the three arresting officers present to verify them, which they did. The secretary refused to allow petitioners, who did not have counsel, the opportunity to speak and offer evidence on their own behalf or cross-examine the officers. The proceedings lasted less than fifteen minutes.

Petitioners remained imprisoned at Lecumberri nearly eight months before the authorities again called them to "los hugados." The secretary on this occasion summarily informed petitioners that they had been found guilty of conspiring to import cocaine and that each petitioner had been sentenced to nine years.[16] The judge, who purportedly had convicted and sentenced petitioners, was not present. In fact, during the four proceedings, petitioners never had come in contact with the presiding judge.[17] The petitioners remained confined at Lecumberri until it was closed down in October of 1976. They were then taken to Oriente prison, a more modern facility. However, after petitioners had spent ten months there, they were transferred to an old prison, Santa Marta, in July of 1977.

The conditions at Santa Marta resembled those at Lecumberri. When petitioners arrived, they were placed in the hole, an extremely cold cell which had neither light, heat, nor windows. Petitioners soon became aware of the notorious "Fourth Guard," the Santa Marta counterpart of the Major and his men. During one of the first nights in the hole, petitioners heard screaming from an adjacent cell. They learned that an inmate, who had disobeyed the Guard's unwritten rules, had been stabbed repeatedly. The inmate was left in the hole without medical attention and subsequently died. On another occasion, the Guard viciously beat an American prisoner in front of petitioners in order to teach them a lesson. These beatings occurred regularly.[18]

16. Rosado's sentence subsequently was reduced to eight years and three months; Velez's and Caban's were reduced to eight years and nine months.

17. Only after petitioners had been sentenced and transferred to Oriente were they brought before the Judge who purportedly had convicted and sentenced them. Addressing a group of prisoners, the Judge stated that those who were not satisfied with their sentence could appeal to a higher court. The Judge would not permit petitioners to speak to him. (Tr. 113-4 Nov. 20, 1978).

18. Mercado described the brutality of the Fourth Guard at Santa Marta:
Q Was it common practice for people to be stabbed with this knife as a warning?
A Right. This was done not in front of everybody. You know, at night around—after 12 o'clock, after you—you are out of your cell, a policeman will come for you, and he will ask you to—with an excuse, you know, you have to go see the chief of command or whoever. So you step out of your cell, and you know already that you're in trouble, something going on. But what can they do? So after awhile people will let you alone, and let you go in the direction of the warden office or wherever they bringing you. The guy will go all the way—the guard—and then—and then the Fourth Guard will appear. They will do what ever they feel like doing to you or wherever they want want to do with you. After they finish with you, the guards will come back, pick you up, and throw you into the hole. You will not receive medical—medical attention in the hole.
Q Did the men receive medical attention before they were thrown in?
A No, no. These guys, when I talk to them, they have to—they were hold—they tried to stand up, one of them, the one that was looking the best to me, he stand up, he was all cut up, and he had great difficulty to talk, because they stab him through here, and cut his tongue, and he told me not to get into—he gave me advice,

Moreover, as in Lecumberri, the prison officials in conjunction with the Guard would demand monetary payment in return for basic life necessities. In petitioners' case, the sub-director of the prison demanded two thousand dollars from each petitioner in return for removing them from the hole.[19] The petitioners stated that they would pay the promised payment. However, petitioners were unable to make the promised payment. They believed that as a result, the Fourth Guard would kill them.

It was at this time that representatives of the United States government approached petitioners about the possibility of transferring to the United States to serve the remainder of their sentences. They presented petitioners with an information booklet (Ptrs. exh. 1) and spoke with them about the terms of the Treaty. In addition, attorneys from the Federal Public Defender's Office advised petitioners individually of the consequences of transferring under the Treaty.

On December 5, 1977, petitioners, while incarcerated at Santa Marta, appeared before a Magistrate, as required by the provisions of the Treaty, to verify their consent to transfer. The Magistrate appropriately informed petitioners of the Treaty's provisions and inquired whether their consents to transfer were voluntary. Based upon petitioners' responses, the Magistrate made a finding that their consents were knowingly, understandingly, and voluntarily made.

Petitioners then signed the requisite consent form. (Ptrs. exh. 7). On December 10, 1977 petitioners were returned to the custody of the United States.[20]

### III.

The Mexican-American Treaty provides that "(s)entences imposed in the United Mexican States on nationals of the United States of America may be served in penal institutions or subject to the supervision of the authorities of the United States of America in accordance with the provisions of this Treaty." *Supra*, art. I(1). The Treaty provides, however, that in order to transfer, an offender must withdraw any appeals pending in Mexico and that the "(t)ransferring State shall have exclusive jurisdiction over any proceedings regardless of their form, intended to challenge, modify, or set aside sentences handed down by its courts." *Id.*, art. VI.

■ In view of the potential waiver of constitutional rights involved, one of the critical provisions of the Treaty requires that the offender voluntarily and knowingly consent to the transfer. *Id.*, art. V(1). Consent, in fact, is the lynchpin of the Treaty. It is essential to conferring upon the receiving state custodial jurisdiction over the offender. Consequently, the Treaty's implementing legislation provides for a consent verification proceeding.[21]

---

you know. He said—told me, "don't get into trouble with—don't get into deals with drugs, grass. You're going to smoke grass, buy from somebody that you know, that is, you know from the direction—never let no one that you don't freely know don't give you anything, because by any chances not from the directory, the direction, you will get punished, you know, and be aware of what I am telling you, so this doesn't happen to you any time." (Tr. 41, 42 Nov. 21, 1978).

**19.** Petitioners spent approximately four thousand dollars each to survive in the various Mexican prisons. (Tr. 85 Nov. 20 1978).

**20.** In order to transfer, petitioners were required to withdraw their appeals. Frederick DePalm, who had accompanied Caban to Mexico and was a co-defendant of petitioners, chose to remain in Mexico and pursue his "amparo" (appeal). Subsequently, the Mexican appellate

court overturned DePalm's conviction for lack of evidence and he was released forthwith. He now resides in the United States, a free man. (Tr. 69–70, 125 Nov. 21, 1978).

**21.** Congress believed that consent was necessary to insulate the Treaty from subsequent and potentially recurring constitutional attack. It, therefore, provided for the consent verification proceedings. In this regard Professor Wechsler articulated the importance of the consent requirement in his testimony to the Senate Committee:

The question that is posed reduces simply, in my view, to this: is it a reasonable exercise of governmental power to imprison or restrain at their election individuals who otherwise would be imprisoned or restrained abroad, and to do so subject to the mitigations that the treaties articulate by making

█ The consent must comport with constitutional standards of voluntariness since an offender is deemed to have waived certain constitutional rights as a consequence of electing to transfer. 18 U.S.C. § 4108(a), (b), (d). The Supreme Court has emphasized that there is "no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed. 844 (1973). The determination of petitioners' consents is a question of fact to be determined from *all* the surrounding circumstances.[22] *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Schneckloth v. Bustamonte, supra* at 226; *U. S. v. Thompson, supra; Weed v. U. S.*, 340 F.2d 827 (10th Cir. 1965). Among the circumstances to be considered in determining voluntariness is length of detention, prolonged nature of questioning, and the occurrence of physical punishment. *Schneckloth v. Bustamonte, supra* 412 U.S. at 226, 93 S.Ct. 2041; *Brown v. Mississippi*, 297 U.S. 278 (1936). Consent which is the result of coercion or duress produced by brutality or violence is constitutionally suspect. *Id.*

█ Guided by these constitutional principles, this Court focuses upon the circumstances that precipitated petitioners' consents subject to the terms of the Treaty to transfer to the custody of the United States.[23] Petitioners initially were subjected to brutal and sustained physical torture. They remained confined for twenty-five months under barbaric conditions. The Mexican prison authorities and certain powerful inmates demanded exorbitant pay-

applicable our release procedures and subject also to the safeguards with respect to an informed [and voluntary] consent that the legislation would provide. I see no room for argument upon that issue.
Penal Treaties with Mexico and Canada: Hearing before the Senate Comm. on Foreign Relations, 95th Cong., 1st Sess. 19 (1977) at 93 (Statement of Herbert Wechsler).
However, the verification proceeding, by nature, is limited in scope and does not preclude constitutional scrutiny of petitioners' consents.

22. In addition, petitioners argue that their consents would be invalid under the test enunciated in *U. S. v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968) wherein the Court stated that Congress cannot posit a defendant with a choice which "unduly penalizes the assertion of a constitutional right." *Id.* at 583, 88 S.Ct. at 121. Petitioners contend that the prospect of remaining in Mexico effectively precluded any meaningful choice concerning the waiver of petitioners' constitutional right to habeas corpus review and, therefore, the waiver is involuntary. While the reasoning of *Jackson* may offer guidance, we rely here on the particular and unique facts of this case in concluding that petitioners' consents were involuntary and need not decide that as a per se rule the Treaty demands an unconstitutional waiver from the transferring offender.

23. Thus, unlike the Magistrate at the verification proceeding, who properly found based upon petitioners' limited responses that their consents were voluntary, this Court is called upon to make the voluntariness determination based upon the facts concerning their experiences in Mexico—facts which were not before the Magistrate at the time he verified their consent.

A If I would still probably be here who would have known what happened? I was afraid for my life. I said I got to get back.
Q You were afraid for your life as a result of the conditions in Santa Marta?
A Yes.
Q Do you recall that? Did you also observe the activities of the Fourth Company?
A Yes, I did.
Q Had you been able to pay all the money that you had promised to pay?
A No.
Q Did that cause you fear?
A That's right.
Q Did you have any certainty, Mr. Bayron, as to where you would be confined or under what conditions you would be confined for the remainder of the sentence?
A I had no idea.
Q And how did that influence your decision to come back to the United States?
A Total, yes.
Q What about, did you have any assurance Mr. Bayron, as to the length of your sentence?
A No.
Q How did that affect your decision to come back to the United States?
A Again, yes, come back because you never know, she change all the time, you know. It's like all of a sudden the law said you got to give more time to these people, drugs, even though your sentence had already, it goes more years you got to do more time. (Tr. 11–12, Nov. 22, 1978).

ments in return for the basic life necessities under threat of severe physical punishment. Petitioners lived in perpetual fear of bodily harm. Moreover, petitioners' confinement was the result of aborted legal proceedings which lacked any semblance of due process guarantees. At the time their consent was procured, petitioners justifiably believed that if they remained incarcerated any longer in Santa Marta, they would be killed. As a result of all of these circumstances and in particular the fear of imminent death, it is clear to this Court that petitioners would have signed anything, regardless of the consequences, to get out of Mexico.[24] Therefore, under the unique facts of this case, petitioners' consents were not truly voluntary, and are therefore, invalid.[25]

■ Based upon the foregoing, the United States has no lawful custody over petitioners under the terms of the Treaty and the writs of habeas corpus are hereby granted. This Court retains jurisdiction in this matter.

It is So Ordered.

---

**24.** Mercado testified concerning his state of mind at the time of the verification proceedings.

[I] was under pressure when I signed the Treaty. I was under pressure, because I spent already 25 months in that place, and I was under pressure that my family was taking care of my needs, and that I was feeling like not a human being. So I have that pressure on me, but I will not say that to the judge, for sure, because the judge, why, he say, "Well, you know—you not going home on the exchange." Yeah, and he said that you were no supposed to challenge the—your sentence. I am not challenging my sentence, I will not challenge my sentence, no way, but I knew that I have a constitutional right, and that I was seeking for justice, and if I move to the United States, I will sure I will obtain this justice. So that's—made me do it.

(Tr. 43 Nov. 21, 1978).

Petitioner Rosado swore in his affidavit that: "I consented to the conditions of the transfer because of the intolerable prison conditions in Mexico; I would have signed anything at all to leave the country." (Aff. of Pedro Rosado Aug. 3, 1978); See also (Tr. 16, 18, 19 Nov. 21, 1978).

Petitioner Velez testified,

Q Now would you tell the Court, Mr. Bayron, how did your treatment by the Mexican authorities at the time of your arrest, at the time of your presentment in what was known as a trial, and in your subsequent imprisonment as we have just gone through, affect your decision to seek a return to the United States?

A Well, I said everything I underwent since I was arrested now, the torture and all that, I said it was a miracle I didn't lose my life.

Q Did you have any faith in the judicial process in Mexico?

A No.

(Tr. 10–12 Nov. 22, 1978).

Petitioner Caban testified,

Q Why did you sign this form?

A Why did I sign it?

Q Yes.

A I signed it cause I wanted to get out of there. It was the only opportunity I had to get out. I wanted to see my family, my wife.

Q What did you think would happen to you if you remained at Santa Marta?

A I knew I was going to get killed, because I fooled them when I tell them I was going to pay them.

Q And really you had no way to pay them, did you?

A No.

(Tr. 123 Nov. 21, 1978).

In addition petitioner Caban maintains that he can understand spanish only and, therefore, could not read the Consent Verification Form which was in English. His signing of the form, without knowing with certainty what it contained, further indicates the total desire of this petitioner to leave Mexico regardless of the consequences.

This case is thus factually distinguishable from *Pfeifer v. U. S. Bureau of Prisons*, 468 F.Supp. 920 (S.D.Cal.1979), apparently the only other case involving the Treaty, where the court denied the petition because it found that the "record in this case does not support Pfeifer's allegations," of involuntary consent. *Id.* at 925.

**25.** Therefore, this Court sees no need at this time to determine the complex constitutional problems presented by the Treaty's possible restriction of the scope of this Court's habeas corpus review.