621 F.2d 1179
 Pedro ROSADO, Efran Morales Caban, and Raymond Bayron Velez,
Petitioners- Appellees,
v.
Benjamin CIVILETTI, Attorney General of the United States,
Raymond Nelson, Warden of the Federal Correctional
Institution at Danbury, Connecticut, and The United States
of America, Respondents-Appellants.
 Nos. 980-982, Dockets 80-2001 to 80-2003.
 United States Court of Appeals,
Second Circuit.
 Argued March 21, 1980.
Decided April 23, 1980.
 
 Richard Blumenthal, U. S. Atty., D. Conn., New Haven, Conn. (George J. Kelly, Jr., Asst. U. S. Atty., Hartford, Conn., and Michael Abbell, Crim. Div., U. S. Dept. of Justice, Washington, D. C., of counsel), for respondents-appellants.
 Eric M. Freedman, New York City (Steven Duke and Dennis Curtis, Yale Law School, of counsel; Robert Suomala, law student intern, on the brief), for petitioner-appellee Rosado.
 Andrew B. Bowman, Fairfield, Conn. (Kleban, Samor, Perles, Dardani & Silvestro, Fairfield, Conn., of counsel), for petitioner-appellee Caban.
 David S. Golub, Stamford, Conn. (Ernest F. Teitell and Silver, Golub & Sandak, Stamford, Conn., of counsel), for petitioner-appellee Velez.
 Before KAUFMAN, Chief Judge, TIMBERS, Circuit Judge, and LASKER, District Judge.*
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 The proud heritage of the Anglo-American judicial system as a bastion of individual liberties is founded, in no small measure, upon the citizen's enduring right of access to courts of law to challenge unwarranted governmental infringements upon his freedom. When all other avenues of relief have been closed, our nation's courts have consistently vindicated the fundamental guaranties of due process of law by invoking their general jurisdiction, either to review executive action otherwise deemed final, or to free those unlawfully restrained through the issuance of a writ of habeas corpus.
 
 
 2
 In the case before us, petitioners are held in custody under federal authority. They have urged the district court to discharge its constitutional obligation to hear their claims and release them from custody. They have demonstrated that their convictions, under the laws of the sovereign state of Mexico, manifested a shocking insensitivity to their dignity as human beings and were obtained under a criminal process devoid of even a scintilla of rudimentary fairness and decency. Accordingly, we reaffirm the authority of the federal courts to hear due process claims raised, as they are here, by citizens held prisoner within the territorial jurisdiction of the United States. Nevertheless, we also recognize the laudable efforts of the executive and legislative branches, by both treaty and statute, to ameliorate, to their utmost power, the immense suffering of United States citizens held in Mexican jails. Indeed, because the statutory procedures governing transfers of these prisoners to United States custody are carefully structured to ensure that each of them voluntarily and intelligently agreed to forego his right to challenge the validity of his Mexican conviction, and because we must not ignore the interests of those citizens still imprisoned abroad, we hold that the present petitioners are estopped from receiving the relief they now seek.
 
 
 3
 * In 1978, Efran Caban, Raymond Velez, Pedro Rosado, and Felix Melendez filed petitions in the District of Connecticut seeking release from federal incarceration in the Danbury Correctional Facility. The petitioners, all United States citizens, had been arrested in Mexico in November 1975 for narcotics offenses. They were subsequently convicted and sentenced to nine years' imprisonment by the Mexican courts.[1] In December 1977, the petitioners were transferred to United States custody pursuant to a treaty between the United States and Mexico providing for the execution of penal sentences imposed by the courts of one nation in the prisons of the other.[2] Under the terms of the treaty, each transferring prisoner is required to consent to his transfer, and is permitted to contest the legality of any change of custody in the courts of the receiving nation.[3] Thus, the petitioners in this case argued that their consents to transfer had been unlawfully coerced and that their continued detention by United States authorities based upon the convictions in Mexico violated their right to due process of law guaranteed by the Fifth Amendment. In support of federal jurisdiction, petitioners relied upon 18 U.S.C. § 3244,[4] as well as various sections of Title 28, including 28 U.S.C. § 2241.[5] To the extent that 18 U.S.C. § 3244(1)[6] purports to reserve to Mexican courts exclusive jurisdiction over challenges to the petitioners' convictions or sentences, they claimed that the limitation suspends the privilege of the writ of habeas corpus in violation of Art. I, § 9, cl. 2 of the Constitution.
 
 
 4
 Three days of hearings were held before Judge Daly during which Caban, Rosado, and Melendez each recounted their experiences in Mexico.[7] Miguel Calderone, a Puerto Rican attorney who had visited the petitioners during their incarceration in Lecumberri Prison also testified, as did the two public defenders who represented the petitioners at consent verification proceedings in Mexico.[8] On July 31, 1979, Judge Daly granted the petitions of Caban, Velez, and Rosado,[9] holding, in a thoughtful opinion, that the prisoners' consents to transfer had been unlawfully coerced by the brutal conditions of their confinement in Mexico. Emphasizing what he deemed to be circumstances unique to these petitioners, the district judge observed that the men lived in daily fear of bodily harm, and believed with justification that they would be killed if they remained incarcerated in Mexico. Consequently, he concluded, "petitioners would have signed anything, regardless of the consequences, to get out of Mexico." Velez v. Nelson, 475 F.Supp. 865, 874 (D.Conn.1979) (footnote omitted).[10] In view of our duty to make an independent determination of the voluntariness of petitioners' consents to transfer, Davis v. North Carolina, 384 U.S. 737, 741-42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966), we shall first explore the history of petitioners' confinement in Mexico and the United States, then proceed to consider the legal principles raised by the Government's appeal in this difficult and perplexing case.
 
 
 5
 * After observing the witnesses' demeanor on direct and cross-examination, Judge Daly credited their testimony. Accordingly, for purposes of this appeal, we shall accept as true the petitioners' undisputed account of their arrests and convictions in Mexico.
 
 
 6
 In substance, the petitioners' testimony establishes that Caban and Freddie DePalm, also a United States citizen, departed New York's Kennedy Airport on November 18, 1975 for a vacation in Acapulco, Mexico. At the airport, the two men had become acquainted with Velez and the three sat together and conversed during the flight to Mexico. When their Aero Mexico airliner made its first scheduled landing in Mexico City, the passengers were informed there would be a one hour delay before proceeding to Acapulco. During the layover, Caban, DePalm, and Velez decided to leave the airport terminal and go to a Holiday Inn nearby. While browsing in the hotel's gift shop, the Americans were approached by six Mexicans in civilian dress, guns drawn, who stated that the Americans were under arrest. No arrest warrants were produced, nor did the Mexicans identify themselves as police officials. Nonetheless, Caban, DePalm, and Velez were each handcuffed and taken to an isolated area of the airport terminal.
 
 
 7
 In the terminal, Caban watched his captors drag Velez into a room, then heard Velez cry out in pain for close to an hour. Caban himself was taken into a separate room where he was searched, stripped and his legs bound. A watch, jewelry, and $400 in cash were taken from his person, but no drugs or contraband were found in his possession. Caban was then shown a photograph of a man represented to be Ramon Rodriguez and asked whether he knew him. When he denied any knowledge of Rodriguez, water was poured over his naked body and an electric cattle prod applied, first to his mouth, then to his testicles and buttocks. His persistent denial of any acquaintance with the man in the photograph led to repeated torture with the electric prod. Thereafter, Caban's interrogators suspended him from the ceiling by clamping a handcuff to his wrist and attaching it to a hook, causing him to lose consciousness from time to time. He remained in this position throughout the day while his captors continued to beat him, threatening to kill him if he refused to admit an acquaintance with Rodriguez. By the end of the day, the weight of Caban's suspended body against the handcuff caused a bone in his arm to break and tear through his wrist.
 
 
 8
 That night, Caban, DePalm, and Velez were taken to Los Separos detention center in Mexico City. Caban noticed that Velez was swollen and bruised, and that he was unable to walk unassisted. At Los Separos, the men were placed in small separate cells containing cement slabs for beds and no plumbing. They were held incommunicado for eight days. The food was inedible and the entire cellblock reeked of human excrement. Throughout their stay at Los Separos, interrogators continued to beat and torture the men with an electric prod in an attempt to elicit confessions.[11]
 
 
 9
 Two days after Caban's arrest in Mexico City, Rosado was arrested in Acapulco upon his arrival on a flight from New York. Though unemployed, Rosado had planned to take a two-day vacation in Acapulco. After passing through customs at the airport, he was confronted by five plainclothes Mexicans bearing pistols and a submachine gun, who asked him to accompany them to a room in the airport. In the room, Rosado saw Melendez, who also had been detained upon his arrival in Acapulco. Rosado was held in the room for two hours while his luggage and personal effects were searched. His ticket, visa, jewelry, and $900 in cash were seized, and he was then driven to a nearby police station along with Melendez.
 
 
 10
 The following morning, the two Americans were flown to Mexico City along with several other prisoners arrested that day and, like Caban, DePalm, and Velez, ended their journeys at Los Separos. When they arrived, Rosado saw the badly beaten body of a man he later learned to be Caban. Melendez was taken into an interrogation room, and Rosado listened from an adjacent holding area as Melendez screamed in apparent agony. After Melendez was returned to the holding area, Rosado was asked by one Mexican officer whether he was ready to tell the truth. When Rosado's responses failed to satisfy his inquisitor, his hands were handcuffed behind his back, his pants lowered, and an electric prod was applied for several minutes at a time to his testicles and penis. Rosado then watched as Melendez was similarly questioned, with the interrogators alternating between beatings and electric torture.
 
 
 11
 After seven or eight days of unceasing brutality, each of the prisoners was finally taken to the prosecutor's office at Los Separos. Caban was told to sign a statement acknowledging his acquaintance with Rodriguez, but refused. Instead, he signed a paper disclaiming any knowledge of Rodriguez or his activities. Rosado was given a statement confessing participation in a gang seeking to import cocaine into Mexico, but he too refused to sign, stating that his sole purpose in coming to Mexico was for a vacation. At no time during the prisoners' initial detention and interrogation were they apprised of the charges against them, or permitted to consult with counsel.
 
 
 12
 Following their visits to the prosecutor, Caban, DePalm, Velez, Rosado, and Melendez were all transferred to Lecumberri Prison, the so-called "Black Castle," where they were crowded into tiny, unheated cells with only two or three beds for ten or twelve prisoners. Four days after Caban's arrival, he was transferred to a more spacious cell, one with five other inmates, a broken toilet, and a single bed but no mattress. His new cell, he was told, would cost $2,000. Failure to pay would result in "discipline" by the "Major," a powerful inmate who enforced this system of extortion with the evident blessing of prison officials, and the muscle of a band of hoodlums called the "Commandos."[12]
 
 
 13
 With the help of his mother, Caban was able to pay the warden $1,700 shortly after his transfer to Lecumberri. Since he was unable to pay the full $2,000, however, he was forced to do faena, a daily work routine for those who failed to pay Lecumberri's "dormitory fee." Work began each day at 3 a. m. when the prisoners were taken from their cells, organized into three groups and ordered to clean the cellblock. One group would be given brooms, another buckets of soapy water, and the third small rags. The remainder of the day would then be spent repeatedly sweeping, washing, and drying the cellblock floors. For hours on end, prisoners would squat and move across the cellblock floor, scrubbing, drying, then scrubbing again. A prisoner who did not move quickly enough, or who refused to work, would be beaten. After seven months of faena, Caban was able to raise the remaining $300 and escape the daily toil.
 
 
 14
 Shortly after their transfer to Lecumberri, the prisoners were brought to los hugados, a courtroom within the prison. There, they were crowded into a small pen separated from the courtroom by a chain link fence. A judge's law secretary briefly informed the men that they had been charged with illegal importation of cocaine, and then sent them back to their cells. Approximately one month later, the prisoners returned to los hugados and were formally advised by the law secretary that they had been indicted for illegal importation of cocaine. The men were shown copies of the statements that had previously been read to them by the prosecutor at Los Separos, and asked whether they were true. Both Caban and Rosado disclaimed the reports, insisting that they were false. The law secretary offered to help the prisoners for a fee but was told that they did not have enough money. The entire proceeding lasted no longer than ten minutes.
 
 
 15
 Two weeks after this "arraignment," the prisoners were brought back to los hugados, ostensibly for a correo constitutional, that is, an opportunity to confront the witnesses against them. Inside the courtroom, Caban saw the officers who had detained and questioned him at the Mexico City Airport, but none of the officers who had arrested Rosado in Acapulco was present. Once again, the law secretary presided over the proceeding, asking each officer whether he ratified his earlier statement against the defendants. At no time were the prisoners permitted to cross-examine the arresting officers, to read the officers' statements, or to speak to the charges against them. The entire proceeding was over in less than fifteen minutes.
 
 
 16
 Seven months later, on August 10, 1976, the men returned to los hugados and were informed by the law secretary that a judge had considered their cases and had sentenced each man to nine years' imprisonment. At no time did they see the judge who sentenced them, obtain the assistance of counsel, or confront the witnesses against them.
 
 
 17
 In October 1976, Lecumberri was closed by the Mexican authorities and the appellees were transferred to Oriente Prison, a more modern and sanitary facility. In contrast to Lecumberri, Oriente was staffed by better trained, less corrupt officers. The prisoners remained at Oriente until July 1977, when they were moved to Santa Marta Penitentiary. Initially, the men were placed in "the hole," a windowless, unheated cell in which there was one bed and no toilet. There, the men were held incommunicado for approximately ten days until the prison director informed them that they would be moved to more habitable cells in the dormitory if they promised to pay him $2,000. Although the men knew they did not have sufficient money to pay the director, they promised to pay and were moved to better quarters in the dormitory. Soon, however, the men learned that Santa Marta differed little from Lecumberri. In addition to the dormitory fee, prisoners regularly paid for the basic necessities of life. Those who disobeyed the guards, or were slow in making payments, were subject to brutal beatings by a favored group of inmates known as the "Fourth Guard." At night, those who had angered the Fourth Guard would be taken from their cells, beaten, stabbed, and frequently left for dead.[13] As a result, both Caban and Rosado feared for their lives, since they were certain the Fourth Guard would kill them if they did not soon raise the $2,000 dormitory fee promised to the director.
 
 B
 
 18
 In 1974, public attention was drawn to the outrageous conditions of confinement in Mexico's jails when Congressmen and journalists in the United States began to investigate complaints of American prisoners and their families. In March 1975, Congressman Fortney Stark of California introduced a resolution calling for increased cooperation and disclosure by the Executive Branch on the plight of some 150 Americans held in Mexico. H.Res. 313, 94th Cong., 1st Sess. (1975). See 121 Cong.Rec. 6740 (Mar. 14, 1975). At congressional hearings on the resolution held in April 1975, Congressman Stark reported that his staff had investigated allegations by 159 Americans imprisoned in Mexico, finding 61 cases in which prisoners claimed they had been forced to sign a confession in Spanish without benefit of an interpreter, 96 cases in which physical torture during interrogation was alleged, 80 cases in which a prisoner claimed to have been held incommunicado for extended periods of time, 50 cases of physical abuse in prison, and 68 cases of extortion by Mexican counsel. U. S. Citizens Imprisoned in Mexico: Hearings Before the Subcommittee on International, Political, and Military Affairs of the House Committee on International Relations (Part I), 94th Cong., 1st Sess. 5 (1975) (statement of Rep. Fortney H. Stark, Jr.) Following a case-by-case review of some 514 Americans incarcerated in Mexico, the State Department's Bureau of Security and Consular Affairs reported in January 1976 that the alleged deprivations of basic rights formed a "credible pattern." U. S. Citizens Imprisoned in Mexico: Hearings Before the Subcommittee on International, Political, and Military Affairs of the House Committee on International Relations (Part II), 94th Cong., 2d Sess. 48 (1976) (statement of Leonard F. Walentynowicz, Administrator, Bureau of Security and Consular Affairs, Department of State). The Bureau was able to substantiate 96 of 136 claimed instances of denied access to counsel or embassy officials, 34 of 48 claimed instances of prolonged detention prior to trial, and 45 of 140 cases in which physical abuse in prison had been asserted. Of the 219 instances in which prisoners claimed to have been physically tortured following arrest, the Bureau found only 33 cases to be unsubstantiated, while 21 instances were proven, and 165 were deemed too inconclusive to resolve. Id. at 49.
 
 
 19
 Efforts to ameliorate the plight of these American citizens were intensified, but new arrestees continued to complain of physical abuse and inadequate process. Indeed, the number of substantiated cases of physical abuse increased from 40 instances in the last six months of 1975, to 61 cases in the first half of 1976. Id. (Part III) at 9 (statement of Leonard F. Walentynowicz, Administrator, Bureau of Security and Consular Affairs, Department of State). Finally, in June 1976, Mexico's Foreign Minister proposed a treaty between the two countries permitting the citizens of either nation who had been convicted in the courts of the other country to serve their sentences in the penal institutions of their native land. Negotiations progressed rapidly and a treaty was signed by representatives of both nations in Mexico City on November 25, 1976. See Letter from Secretary of State Kissinger to President Ford (Jan. 17, 1977), reprinted in H.R.Rep.No. 95-720, 95th Cong., 1st Sess. 17-18 (1977). Following extensive hearings in the Senate Foreign Relations and Judiciary Committees, the full Senate unanimously approved the treaty by a vote of 90 to 0 on July 21, 1977. 123 Cong.Rec. S12,553 (daily ed. July 21, 1977).[14] Enabling legislation was approved by Congress and signed into law on October 28, 1977,[15] and the treaty became effective on November 30, 1977. See Treaty on the Execution of Penal Sentences, Nov. 25, 1976, United States-Mexico, T.I.A.S. No. 8718, reprinted in S.Exec.Doc.D., 95th Cong., 1st Sess. (1977) (hereinafter cited as "Treaty").
 
 
 20
 Under the Treaty, a United States citizen convicted of a criminal offense in Mexico may transfer from Mexican to American custody for the balance of his sentence provided certain conditions are met. The offense for which he has been convicted must also be generally punishable in the United States,[16] and can be neither a political nor immigration offense.[17] Moreover, the transferring offender must be both a national of the United States and not a domiciliary of Mexico.[18] Only prisoners with a minimum of six months remaining on their sentence, and for whom no appeal or collateral attack is currently pending in the Mexican courts, are eligible for transfer.[19] Finally, Mexico, the United States, and the transferring prisoner must all give their consent to the change in custody.[20]
 
 
 21
 The potential benefits to a prisoner transferring under the Treaty are considerable. Not only will he be repatriated to his homeland where the culture and language will be familiar and his family closer at hand, but the Treaty specifically provides that the law of the Receiving State will govern his eligibility for parole,[21] the conditions of his confinement, and any attack he may bring upon the validity of his transfer or the constitutionality of the Treaty and its implementing legislation.[22] In addition, a transferred offender is protected against double jeopardy in the United States on account of the crime for which he was convicted in Mexico,[23] and any prejudice to his civil rights in the United States other than the collateral consequences normally accorded a Mexican conviction by American law.[24] Both the Treaty[25] and implementing legislation[26] specifically provide, however, that the courts of the transferring nation shall have exclusive jurisdiction over proceedings brought by a transferring offender to challenge, modify, or set aside convictions or sentences handed down by its courts. An American citizen seeking transfer to United States custody is required to understand and agree that any action challenging his conviction or sentence must be brought in Mexican, not United States, courts,[27] and any transferred offender who succeeds in establishing the invalidity of his transfer in a United States court may be returned to Mexico to serve the balance of his sentence.[28]
 
 C
 
 22
 Two months after Caban, Velez, and Rosado promised but failed to pay $2,000 to the director of Santa Marta, representatives from the United States Embassy visited the men at the prison and informed them of the possibility of transfer to United States custody pursuant to the Treaty. They were each given booklets prepared by the United States Department of Justice explaining the terms of the Treaty and the consequences of an election to transfer. The booklet specifically advised that because the Treaty gave Mexico exclusive jurisdiction over actions brought by transferees to challenge, modify, or set aside sentences imposed by its courts, a United States citizen who transferred to American custody would not have any legal remedies available in the United States to challenge, modify, or set aside his conviction or sentence. The booklet went on to state, however, that neither the Treaty nor its implementing legislation "seeks to prevent transferring offenders from bringing habeas corpus actions to challenge the constitutionality of the Treaty and/or the implementing legislation, or the manner of the execution of their confinement by United States authorities." U.S. Dep't of Justice, Information Booklet for United States Citizens Incarcerated in Mexican Prisons 7 (1977).
 
 
 23
 After the prisoners expressed an interest in transferring to United States custody, an attorney from the Federal Public Defender's Office in Texas met with each individually and explained in detail the consequences of a transfer under the Treaty. On December 5, 1977, the men appeared separately before a United States magistrate at the prison to verify their consents to transfer.[29] The magistrate questioned each petitioner about his knowledge of the Treaty's provisions, specifically asking each man whether he understood and agreed to abide by the condition requiring challenges to his conviction or sentence to be brought by proceedings instituted in Mexican courts. Each was also advised that if a United States court subsequently determined his consent to transfer had not been given in accordance with the Treaty or United States law, he could be returned to Mexico to serve the remainder of his sentence. In each case, once the magistrate satisfied himself that the applicant's consent to transfer was given knowingly and voluntarily, without threat or coercion, he permitted the petitioner to sign a standard form of consent.
 
 II
 
 24
 In appraising the voluntariness of the petitioners' consents to transfer, Judge Daly relied primarily upon Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), in which the Supreme Court upheld the validity of a citizen's consent to a police search of his automobile under the Fourth Amendment. In Schneckloth, the Court eschewed any "talismanic definition" of voluntariness, id. at 224, 93 S.Ct. at 2046, stressing instead that the issue presented a "question of fact to be determined from all the circumstances," id. at 248-49, 93 S.Ct. at 2059. In the context of searches and seizures, the Court noted that a balance must be struck between our collective interest in effective law enforcement, and our constitutional insistence upon personal freedom from unwarranted governmental intrusions. Id. at 225, 93 S.Ct. at 2046. Striking that balance in Schneckloth, the Court implicitly recognized that its rule would serve to define the degree to which overzealous law enforcement would be deterred, and individual rights vindicated.
 
 
 25
 In the case at bar, however, we are in no position to deter by our decision the acts complained of by petitioners. The sources of torture, abuse, and coercion to which they point as invalidating their consents emanate not from United States authorities, but Mexican officers, acting within the territorial sovereignty of Mexico, without American direction or involvement. Although the Bill of Rights does apply extraterritorially to protect American citizens against the illegal conduct of United States agents, Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974), it does not and cannot protect our citizens from the acts of a foreign sovereign committed within its territory. Neely v. Henkel, 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901); United States v. Lira, 515 F.2d 68 (2d Cir.), cert. denied, 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975). For example, in Lira, a Chilean national was abducted from his home by Chilean police, beaten, tortured with electric shocks, and then placed on a plane for New York, where he was arrested by federal narcotics agents. In upholding the jurisdiction of the district court to try Lira, we expressly held that relief from acts of torture by foreign agents could be granted only upon a showing of direct United States governmental involvement. Otherwise, we reasoned, the court's holding would serve no deterrent function, and vindicate no constitutionally recognized right.
 
 
 26
 (W)here the United States Government plays no direct or substantial role in the misconduct and the foreign police have acted not as United States agents but merely on behalf of their own government, the imposition of a penalty would only deter United States representatives from making a lawful request for the defendant and would not deter any illegal conduct.
 
 
 27
 Id. at 71.
 
 
 28
 It is noted that a contrary holding in Lira would not only have failed to vindicate any constitutional right of the defendant, but also would have obstructed our national interest in effective law enforcement. Since the United States makes no claim to a valid law enforcement interest with respect to these petitioners, it may be argued that a court should not deny a remedy to one tortured abroad when to do so would serve no countervailing interest.
 
 
 29
 But the United States does assert two other interests in upholding the validity of these petitioners' consents, both comparably significant. First is the Government's substantial interest in promoting good relations with Mexico by honoring its criminal convictions and recognizing the integrity of its criminal justice system. Cf. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).[30] Since Mexico is a sovereign nation in no sense subject to the judgments of this Court, we could neither deter its officials from committing similar cruelties in the future, nor vindicate the individual interests of those still incarcerated in Mexican prisons, by invalidating these petitioners' consents. At most, we would simply complicate our delicate relations with Mexico. More important, however, is the interest of those Americans who are currently, or may soon find themselves, caught up in Mexico's criminal justice system. If, here, the conduct of Mexican officials on Mexican soil were held to be determinative of the voluntariness of an American prisoner's consent to transfer, those prisoners most desperately in need of transfer to escape torture and extortion, including the petitioners at bar, would never be able to satisfy a magistrate that their consents were voluntarily given.[31]
 
 
 30
 This anomalous result stems in part from the district court's adoption of a standard of voluntariness designed to govern consensual searches and seizures within the United States. Though we can find no case presenting facts on point to guide us in these extraordinary circumstances, it is readily apparent that a decision whether to permit a police officer to search one's car does not remotely resemble the choice presented to these petitioners under the Treaty. In our view the choice that faces an American imprisoned in Mexico in deciding whether to transfer more closely resembles a decision confronted by nearly every criminal defendant today: whether to plead guilty and accept a set of specified sanctions ranging from probation to a possibly long prison sentence, or to stand trial and face unknown dispositions ranging from possible acquittal to a severe maximum sentence or even death. In the plea bargaining context, as in the case at bar, the choice involves liberty and incarceration on both sides of the equation.
 
 
 31
 Accordingly, we turn for guidance to the line of cases construing the voluntariness of guilty pleas, beginning with United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). In Jackson, the Court invalidated a provision of the Federal Kidnapping Act permitting imposition of the death penalty only upon the jury's recommendation, because it concluded the provision unnecessarily induced defendants to waive their constitutional right to a trial by jury. The holding promptly spawned a number of challenges to guilty pleas in general, asserting that the defendant's plea had been involuntarily induced by the risk of receiving a death sentence if he insisted upon his right to a jury trial. In response, the Court quickly made clear that not all guilty pleas were invalid simply because the death penalty could be imposed only after trial by jury. In Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), the Court explained that the question centers on whether the provision " 'needlessly penalize(d) the assertion of a constitutional right.' " Id. at 746, 90 S.Ct. at 1468, quoting Jackson, supra, 390 U.S. at 583, 88 S.Ct. at 1217. See Corbitt v. New Jersey, 439 U.S. 212, 219 n. 9, 99 S.Ct. 492, 497 n. 9, 58 L.Ed.2d 466 (1978). If not, the voluntariness of a given plea is to be judged by whether it was a knowing, intelligent act "done with sufficient awareness of the relevant circumstances and likely consequences." Brady, supra, 397 U.S. at 748, 90 S.Ct. at 1469.
 
 
 32
 Subsequently, in North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), the Court emphasized that the "voluntariness" of a guilty plea is determined by considering, not whether the defendant's decision reflected a wholly unrestrained will, but rather whether it constituted a deliberate, intelligent choice between available alternatives. The petitioner in Alford had consistently insisted that he had not committed the killing for which he was charged. Nonetheless, he claimed that he had pleaded guilty to second degree murder because his attorney advised him the evidence against him was so persuasive that if he requested a jury trial, he would run a considerable risk of receiving the death sentence. The defendant subsequently petitioned for a writ of habeas corpus on the ground that his guilty plea had been involuntarily entered because motivated by a fear of the death penalty. Focusing upon the alternatives open to the defendant when he entered his plea, the Court concluded that the decision to forego a jury trial and thus avoid the risk of a death sentence represented a voluntary and intelligent choice among the available alternatives. "When his plea is viewed in light of the evidence against him, which substantially negated his claim of innocence and which further provided a means by which the judge could test whether the plea was being intelligently entered . . . its validity cannot be seriously questioned." Id. at 37-38, 91 S.Ct. at 167 (citation omitted). Since the evidence of guilt was, for practical purposes, conclusive, the choice between trial by jury and potential death on the one hand, or pleading guilty and certain imprisonment on the other, was not unjustifiably coercive.
 
 
 33
 Similarly, if the instant petitioners' consents to transfer are viewed in light of the alternatives legitimately available to them, it cannot be seriously doubted that their decisions were voluntarily and intelligently made. Petitioners, convicted by Mexican courts for crimes committed in Mexico, were confined to the legal process accorded criminal defendants in that country. While incarcerated there, they possessed no right of access to United States courts and, apart from the Treaty, no option but to serve their sentences in Mexico while seeking redress from its courts. Pursuant to the Treaty, however, petitioners were presented with the alternative of transfer to American custody and, consequently, the distinct advantage of receiving the protection of American laws governing parole[32] and the conditions of their confinement. Their choice was thus between continued incarceration under the brutal regime that prevailed in Mexican prisons, or repatriation. In either event, they would retain their right to seek redress from the Mexican courts, but could not challenge their convictions or sentences in United States courts. Though it may well be, as Judge Daly concluded, that anyone in similar circumstances would choose to transfer, the same may also be said for the defendant in Alford.[33] In view of the alternatives legitimately available to petitioners, we conclude that their consents to transfer were voluntarily and intelligently made.
 
 III
 
 34
 Regardless of the validity of the petitioners' consents to transfer, it is also claimed that the Treaty and enabling legislation deprive petitioners of their liberty without due process of law in violation of the Fifth Amendment. Though a transferring prisoner's arrest, interrogation, trial, and ultimate conviction all occur in Mexico, at the hands of Mexican authorities, his liberty is restricted by United States authorities once he is placed in American custody. Accordingly, we must determine whether the United States Government may imprison a citizen in execution of a criminal sentence imposed by a foreign tribunal acting within its jurisdiction and, at the same time, deny him access to a United States court to challenge the fundamental fairness of the criminal process that led to his conviction abroad.
 
 
 35
 * In dictum too old to question, Chief Justice Marshall declared that "(t)he courts of no country execute the penal laws of another." The Antelope, 23 U.S. (10 Wheat.) 66, 123, 6 L.Ed. 408 (1825). Speaking in the context of a libel brought to recover 280 slaves found in the hold of a Venezuelan privateer captured in American waters, Marshall held that the penal statutes of no country could unilaterally alter the law of nations. "No principle of general law is more universally acknowledged," Marshall stated, "than the perfect equality of nations. . . . It results from this equality, that no one can rightfully impose a rule on another." Id. at 122. Thus, although the United States and Great Britain had enacted measures to outlaw the slave trade, it could not be said that these measures, in and of themselves, worked to alter the general international recognition of the legality of slavery.
 
 
 36
 Though no nation may unilaterally bind another sovereign by the sheer force of its statutory enactments, nothing in the doctrine enunciated by Marshall precludes a sovereign power from extending recognition to another's penal laws where it chooses to do so. Nor does Marshall's dictum suggest any principle limiting the power of sovereign nations to enter into mutual compacts or treaties obligating the signatories to honor and enforce the penal decrees of one another. In the United States, the constitutionality of such measures was decided long ago when the Supreme Court upheld an extradition agreement with foreign nations as a valid exercise of the treaty-making power. See Terlinden v. Ames, 184 U.S. 270, 289, 22 S.Ct. 484, 491, 46 L.Ed. 534 (1902). See also Holmes v. Jennison, 39 U.S. (14 Pet.) 540, 569-70, 10 L.Ed. 579 (1840). Even where the treaty fails to secure to those who are extradited to another country the same constitutional safeguards they would enjoy in an American criminal trial, it does not run afoul of the Constitution. See Neely, supra, 180 U.S. at 122-23, 21 S.Ct. at 306-07. Moreover, criminal convictions imposed by foreign tribunals have served as predicates for enhanced sentencing under state multi-offender statutes. See, e. g., United States ex rel. Dennis v. Murphy, 265 F.2d 57 (2d Cir. 1959); United States ex rel. Foreman v. Fay, 184 F.Supp. 535 (S.D.N.Y.1960).
 
 
 37
 The instant Treaty does not call upon the United States to enforce Mexico's penal laws or procedures, but only to execute criminal convictions entered in its courts against American citizens who elect to transfer to United States custody. Thus, once a prisoner has consented to transfer, the United States is bound simply to take custody of the offender and, with a few significant exceptions,[34] detain him as if he had been convicted in a United States court. The Treaty serves to ameliorate the condition of Americans imprisoned in Mexico by offering them an opportunity for repatriation and, hopefully, better prison conditions and more positive means for rehabilitation. In lessening the number of United States citizens incarcerated in Mexico, the Treaty additionally serves to relieve a worrisome source of tension in Mexican-American relations. In view of these benevolent purposes, we believe the Treaty is a valid exercise of the treaty-making power conferred by Art. II, § 2, cl. 2 of the Constitution. See Reid, supra, 354 U.S. at 16-17, 77 S.Ct. at 1230; Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920).
 
 B
 
 38
 Although we can discern no constitutional impediment to a judgment by the President and Congress that the transfer of convicted criminal defendants is a worthy object of international accord, the execution of foreign penal decrees may not serve as an artifice to circumvent the procedural and substantive guaranties of the Bill of Rights. Among these provisions, the Fifth and Sixth Amendments are particularly relevant to these petitioners' claims. The Fifth Amendment expressly provides:
 
 
 39
 No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . nor shall any person . . . be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . .
 
 The Sixth Amendment is equally clear:
 
 40
 In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.
 
 
 41
 It is undisputed that these petitioners have received none of the process constitutionally required for the trial and conviction of criminals in United States courts. Nonetheless, they are incarcerated under federal authority. In support of their continued detention, the Government points solely to the petitioners' convictions in Mexico, and the Treaty provisions, supplemented by the implementing legislation, which provide for United States imprisonment of American citizens convicted in Mexico. Nowhere does the Treaty or enabling legislation expressly grant petitioners a right to challenge their continued confinement in the United States under sentences imposed by Mexican courts. Indeed, 18 U.S.C. § 3244(1) purports to reserve to the courts of Mexico exclusive jurisdiction over proceedings to challenge, modify, or set aside petitioners' convictions or sentences. Accordingly, we must determine whether Congress can provide for the deprivation of a citizen's liberty through incarceration, while withholding all right of access to United States courts to test the basis for his confinement.
 
 
 42
 It is an unassailable tenet of our constitutional system that the Government's power to punish citizens may be exercised only in accordance with the due process of law prescribed by the Bill of Rights. See Ex parte Milligan, 71 U.S. (4 Wall.) 2, 119, 18 L.Ed. 281 (1866); Reid, supra, 354 U.S. at 5-6, 77 S.Ct. at 1224-1225. Whether the constitutional guaranty of due process further requires that any imposition of punishment carry with it a right of access to a United States court to test the basis for the sanctions imposed is a question never fully resolved. In the case at bar, the Government seeks to deprive the petitioners of their liberty in recognition of a conviction returned by a court beyond the jurisdiction of the United States. Though our research has disclosed no case directly in point, the nature and extent of process to be accorded those committing crimes abroad has been considered in a variety of related contexts.
 
 
 43
 In In re Ross, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581 (1891), the Supreme Court denied habeas relief to a seaman imprisoned in the United States following his conviction for murder by an American consular court sitting in Japan. Under a treaty with that country, the United States was given jurisdiction over criminal offenses committed by Americans in Japan. The implementing legislation enacted by Congress vested jurisdiction to try all such offenses in consular tribunals. In challenging his conviction in the consular court, Ross argued that he had been denied due process since he had not been indicted or tried by a jury. The court rejected these claims out of hand, holding that the "Constitution can have no operation in another country. When . . . the representatives or officers of our government are permitted to exercise authority of any kind in another country, it must be on such conditions as the two countries may agree, the laws of neither one being obligatory upon the other." Id. at 464, 11 S.Ct. at 900.
 
 
 44
 The Court had occasion to reconsider Ross in Reid, supra, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148. Covert, the wife of an American serviceman stationed in England, was charged with her husband's killing. Pursuant to a provision of the Uniform Code of Military Justice, all persons accompanying the armed forces abroad were subject to court-martial by a military tribunal for any criminal offense related to the military. Mrs. Covert was tried, convicted, and sentenced to life imprisonment by a military court-martial, then incarcerated in the United States. A district court order granting her release on a writ of habeas corpus was first reversed by the Supreme Court, Reid v. Covert, 351 U.S. 487, 76 S.Ct. 880, 100 L.Ed. 1352 (1956), then affirmed on reconsideration. Reid, supra, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148. In withdrawing its earlier decision, a plurality of the Court expressly rejected the reasoning of Ross : "(w)hen the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land." Id. at 6, 77 S.Ct. at 1225. Two concurring justices attempted to distinguish Ross by limiting its applicability to instances where historical or political necessities dictate a flexible approach. Id. at 64, 77 S.Ct. at 1255. (Frankfurter, J., concurring); id. at 74-75, 77 S.Ct. at 1260 (Harlan, J., concurring). But a majority agreed that insofar as Ross disclaimed any extraterritorial force to the Constitution, it was no longer good law. Id. at 56, 77 S.Ct. 1251 (Frankfurter, J., concurring).
 
 
 45
 Covert was tried and convicted in an American tribunal under a treaty that conferred jurisdiction on United States authorities over crimes committed by American citizens. In the instant case, however, petitioners were convicted in Mexican courts for crimes committed within that country. A somewhat analogous situation was presented in Hirota v. MacArthur, 338 U.S. 197, 69 S.Ct. 197, 93 L.Ed. 1902 (1948), where two Japanese citizens held in United States custody in Japan following their conviction for war crimes by an international tribunal sought leave to file original petitions for writs of habeas corpus in the Supreme Court. The Court denied leave, holding that it lacked power or authority to review the convictions. Id. at 198, 69 S.Ct. 197.[35]
 
 
 46
 The following term, the Court again considered petitions filed on behalf of enemy aliens held in custody abroad by United States authorities. Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). While stressing the historic right of access to American courts enjoyed by citizens, id. at 769-70, the Court found no constitutional right to sue for habeas relief in United States courts where the petitioner was an alien enemy who never resided in the United States, was captured beyond American territory, and was tried, convicted, and imprisoned abroad for offenses committed outside the United States, id. at 777-78, 70 S.Ct. at 943. In contrast to Eisentrager, however, the petitioners at bar are United States citizens incarcerated within the territory of the United States.
 
 
 47
 Another useful point of reference is found in cases where a foreign sovereign seeks to extradite an American citizen for trial abroad. Where extradition is sought pursuant to a valid treaty, the Supreme Court has held that the relator cannot prevent his extradition simply by alleging that the criminal process he will receive fails to accord with constitutional guaranties. See Neely, supra, 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448. Since the Constitution bears no relation to crimes committed beyond the jurisdiction of the United States against the laws of a foreign sovereign, a citizen who "commits a crime in a foreign country cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations." Id. at 123, 21 S.Ct. at 307. See also Wilson v. Girard, 354 U.S. 524, 529, 77 S.Ct. 1409, 1412, 1 L.Ed.2d 1544 (1957) ("sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly . . . consents to surrender its jurisdiction"). Thus, where a relator challenges the fairness of foreign process, courts "are bound by the existence of an extradition treaty to assume that the trial will be fair." Glucksman v. Henkel, 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911).
 
 
 48
 In both Neely and Girard, however, minimal safeguards to ensure a fair trial in the foreign tribunal were provided. Neely, supra, 180 U.S. at 112, 123, 21 S.Ct. at 303, 307; Wilson, supra, 354 U.S. at 547, 77 S.Ct. at 1420 (Appendix B). Moreover, this court has previously indicated that the presumption of fairness routinely accorded the criminal process of a foreign sovereign may require closer scrutiny if a relator persuasively demonstrates that extradition would expose him to procedures or punishment "antipathetic to a federal court's sense of decency." Gallina v. Fraser, 278 F.2d 77, 79 (2d Cir.), cert. denied, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960); United States ex rel. Bloomfield v. Gengler, 507 F.2d 925 (2d Cir. 1974). Finally, to the extent that the United States itself acts to detain a relator pending extradition, it is bound to accord him due process. See Grin v. Shine, 187 U.S. 181, 184, 23 S.Ct. 98, 99, 47 L.Ed. 130 (1902); Gallina, supra, 278 F.2d at 78. Thus, although the Constitution cannot limit the power of a foreign sovereign to prescribe procedures for the trial and punishment of crimes committed within its territory, it does govern the manner in which the United States may join the effort. Compare Toscanino, supra, 500 F.2d 267 with Lira, supra, 515 F.2d 68.
 
 
 49
 In our view, however, the cases that provide the closest analogy to the instant petitions are those stemming from congressional efforts to limit the immigration of Chinese and Japanese aliens to the United States. During the latter half of the nineteenth century, Congress responded to intense political pressure from western states to check the influx of Asian immigrants by enacting a sweeping administrative scheme designed to detain and summarily exclude aliens of Chinese or Japanese descent found entering the United States illegally. In The Chinese Exclusion Case, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889), the Supreme Court upheld the power of Congress to provide for the exclusion of Asian aliens solely by means of executive action. Subsequently, the Court held that the power to exclude aliens at the border necessarily included the power to expel those found within the United States without creating any right to judicial review of the administrative action. See Fong Yue Ting v. United States, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893). Even where a petitioner claimed that he had wrongfully been deprived of a treaty or visa right to enter the country, the Court held that Congress had not provided a right to judicial review, and that the petitioner was therefore left to whatever process Congress had seen fit to confer. See Lem Moon Sing v. United States, 158 U.S. 538, 15 S.Ct. 967, 39 L.Ed. 1082 (1895). Finally, in United States v. Ju Toy, 198 U.S. 253, 25 S.Ct. 644, 49 L.Ed. 1040 (1905), the Court held that an Asian, who sought to enter the United States and claimed to be a native-born citizen, could not challenge the correctness of an administrative decision denying entry by writ of habeas corpus. The Court conceded that exclusion of a citizen would constitute a form of punishment, but even assuming "that the Fifth Amendment applies to him and that to deny entrance to a citizen is to deprive him of liberty, we nevertheless are of opinion that with regard to him due process of law does not require a judicial trial." Id. at 263, 25 S.Ct. at 646.
 
 
 50
 Much like the enabling legislation limiting the present petitioners' access to federal court, the Supreme Court's reasoning in Ju Toy rested upon the premise that an immigrant enjoyed no constitutionally protected rights while outside the territorial jurisdiction of the United States. Consequently, the Court held that Congress was free to limit his right to enter the country, and specify the terms upon which he could, and could not, obtain judicial redress for any claimed deprivations of his liberty. Ju Toy, however, espoused a doctrine to which the Supreme Court did not long adhere.
 
 
 51
 Two years before Ju Toy, in The Japanese Immigrant Case, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903), the Court had decided that the final authority conferred upon executive officers to pass upon the status of Asian immigrants did not permit arbitrary disregard of the fundamental principles inherent in due process of law. "One of these principles," the Court stated, "is that no person shall be deprived of his liberty without opportunity, at some time, to be heard, before such officers, in respect of the matters upon which that liberty depends . . . ." Id. at 101, 23 S.Ct. at 614. Since the petitioner had been accorded an opportunity to present her claims to an administrative officer, the Court concluded there was no need for judicial intervention.
 
 
 52
 The doctrine of The Japanese Immigrant Case was soon expanded in Chin Yow v. United States, 208 U.S. 8, 28 S.Ct. 201, 52 L.Ed. 369 (1908). Like Ju Toy, Chin Yow also claimed that he was a native-born American citizen. Unlike Ju Toy, however, his petition for a writ of habeas corpus sought relief from the administrative order denying his entry on the ground that he had been denied a fair opportunity to present his case for citizenship to the executive authorities. To Mr. Justice Holmes, who had written for the majority in Ju Toy, the difference was crucial. Again writing for the majority, Holmes stressed the constitutional requirement of a hearing reasonably calculated to produce a correct result.
 
 
 53
 If one alleging himself to be a citizen is not allowed a chance to establish his right in the mode provided by (the exclusion) statutes, although that mode is intended to be exclusive, the statutes cannot be taken to require him to be turned back without more. The decision of the Department is final, but that is on the presupposition that the decision was after a hearing in good faith, however summary in form.
 
 
 54
 Id. at 12, 28 S.Ct. at 202. Finally, in Ng Fung Ho v. White, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938 (1922), the Court abandoned Ju Toy. In its judgment, the threat to liberty posed by the exclusion of one claiming to be a citizen was so grave that the determination of citizenship could not be entrusted to executive officers. "Against the danger of such deprivation without the sanction afforded by judicial proceedings, the Fifth Amendment affords protection in its guarantee of due process of law." Ng Fung Ho, supra, 259 U.S. at 284-85, 42 S.Ct. at 495.
 
 
 55
 The right to a fair procedure reasonably calculated to produce a correct determination of the basis for the imposition of penal sanctions lies at the heart of the due process of law protected by the Fifth Amendment. As Chin Yow and Ng Fung Ho teach, the United States may not deprive an individual of his liberty unless such a procedure is first accorded. See also The Japanese Immigrant Case, supra, 189 U.S. at 100-01, 23 S.Ct. at 614; Estep v. United States, 327 U.S. 114, 119-20, 122-23, 66 S.Ct. 423, 425-26, 427, 90 L.Ed. 567 (1946); Oestereich v. Selective Service Board, 393 U.S. 233, 243 n. 6, 89 S.Ct. 414, 416 n. 6, 21 L.Ed.2d 402 (1968) (Harlan, J., concurring). Where one has been denied his right to a fair hearing prior to the imposition of penal sanctions restraining his liberty, habeas corpus provides the appropriate remedy. Chin Yow, supra, 208 U.S. at 13, 28 S.Ct. at 202; Gusik v. Schilder, 340 U.S. 128, 132-33, 71 S.Ct. 149, 151-52, 95 L.Ed. 146 (1950).[36]
 
 
 56
 In the case at bar, petitioners face not the danger of deprivation, Ng Fung Ho, supra, 259 U.S. at 284-5, 42 S.Ct. at 495, but the reality of liberty already lost. Nonetheless, it is undisputed that at no time did they receive even the barest rudiments of a process calculated to arrive at the truth of the accusations against them. They did not receive the assistance of counsel during the Mexican criminal proceedings against them, nor were they ever accorded an opportunity to appear before the judge who allegedly decided their case. They were not permitted to address the charges against them, or present any evidence at all. No opportunity was given Rosado to confront the witnesses against him, and neither Caban nor Velez was allowed to cross-examine their accusers. Most egregious of all, the law secretary who presided over the proceedings against the petitioners offered the influence of his position to help petitioners for a fee.
 
 
 57
 Under such circumstances, we believe these petitioners have a right to test the basis for their continued confinement in a United States court. In reaching this conclusion, we by no means imply that each element of due process as known to American criminal law must be present in a foreign criminal proceeding before Congress may give a conviction rendered by a foreign tribunal binding effect. Indeed, we are keenly sensitive to the historical and cultural limitations of our own constitutional heritage, and respect the similarly indigenous underpinnings of the process accorded criminal defendants abroad. We simply hold that a petitioner incarcerated under federal authority pursuant to a foreign conviction cannot be denied all access to a United States court when he presents a persuasive showing that his conviction was obtained without the benefit of any process whatsoever. Cf. United States ex rel. Bloomfield, supra, 507 F.2d at 928. Having thus determined that petitioners possess a right to challenge the basis for their continued confinement under United States custody, we must proceed to consider the merits of their claim, unless there appears some further reason to withhold relief. Johnson v. Zerbst, 304 U.S. 458, 462-65, 58 S.Ct. 1019, 1022-23, 82 L.Ed. 1461 (1938).
 
 IV
 
 58
 During the petitioners' consent verification proceedings in Mexico, each was specifically asked whether he understood and agreed to abide by the Treaty provision granting Mexico exclusive jurisdiction over all proceedings seeking to challenge, modify, or set aside sentences imposed by its courts. Each indicated that he understood the provision and agreed to abide by the condition. Accordingly, we must decide whether the petitioners are now estopped from challenging their Mexican convictions in United States courts.
 
 
 59
 In enacting the enabling legislation, Congress went to great lengths to ensure that a transferring prisoner would not only be informed of the Treaty's provisions, but agree to abide by them as well. Section 4108(b)(1) of Title 18 expressly provides that the verifying officer "shall inquire of the offender whether he understands and agrees" that Mexico is given exclusive jurisdiction to hear challenges to his conviction and sentence.
 
 
 60
 As originally introduced in the Senate, the bill that ultimately became § 4108 simply required that a transferring offender be informed that "by his consent (to transfer) he waives all rights he might have had to institute proceedings in the courts of the United States seeking to challenge . . . his conviction or sentence." See S. 1682, 95th Cong., 1st Sess. § 4108(b)(1) (1977), reprinted in Transfer of Offenders and Administration of Foreign Penal Sentences: Hearings Before the Subcommittee on Penitentiaries and Corrections of the House Judiciary Committee, 95th Cong., 1st Sess. 16 (1977). A memorandum prepared for the State Department and submitted to the House subcommittee considering the bill noted, however, that a transferring offender did not possess a right of access to United States courts at the time he executed his consent in Mexico. Accordingly, it cautioned, a consent which purported to waive a right the offender did not possess at the time it was executed might not withstand judicial scrutiny upon the prisoner's transfer to the United States. Instead, it suggested, Congress should employ the doctrine of estoppel and require transferring prisoners to agree not to challenge their Mexican convictions in United States courts. Implementation of Treaties for the Transfer of Offenders To or From Foreign Countries: Hearings Before the Subcommittee on Immigration, Citizenship, and International Law of the House Judiciary Committee, 95th Cong., 1st Sess. 269-70 (1977) (Oct. 14, 1977 Memorandum of Prof. Detlev Vagts, Harvard Law School).
 
 
 61
 After witnesses at both House and Senate hearings emphasized the crucial importance of securing a binding, voluntary consent to transfer that would preclude returning prisoners from challenging their Mexican convictions in United States courts,[37] the bill was amended in the Senate Judiciary Committee to require an express agreement by the prisoner to bring any attacks upon his conviction or sentence solely in the Mexican courts. See S.Rep. No.95-435, 95th Cong., 1st Sess. 5, 9 (1977). As amended, the bill passed both the Senate, 123 Cong.Rec. S15,282 (daily ed. Sept. 21, 1977), and the House, 123 Cong.Rec. H11,468 (daily ed. Oct. 25, 1977), with scant opposition.
 
 
 62
 As we have mentioned, Mexico, the United States, and each offender requesting transfer must give their consent to the change in custody before a prisoner may be transferred.[38] The consents contemplated by the Treaty entail much more than simple expressions of the desire to transfer, and the permission to do so. They also include reciprocal representations by each of the parties upon which the others rely in deciding to give their consent. For example, the United States promises Mexico that it will execute the prisoner's Mexican conviction and provide biannual reports on the status of the offenders who have transferred to the United States.[39] It also promises the prisoner that he will enjoy the benefit of parole in accordance with United States law.[40] Mexico agrees to relinquish custody of an individual found to have committed a criminal offense within its jurisdiction, while promising to hear subsequent challenges to the sentences rendered by its courts.[41] For his part, the transferring prisoner agrees to his change in custody, and further promises to abide by the terms of the Treaty, including the reservation of jurisdiction to Mexico over all challenges to convictions and sentences imposed by its courts.[42]
 
 
 63
 It requires little imagination to conclude, in light of this background, that if petitioners had refused to agree to abide by the Treaty's conditions, neither Mexico nor the United States would have consented to their transfers. Accordingly, petitioners would have continued to be imprisoned in Mexico, without right of access to American courts. But that fact alone does not persuade us their bargain should be enforced. If, in holding these petitioners to their agreement, we would serve no substantial and legitimate governmental interest which the United States put in jeopardy in reliance upon their promises not to attack their convictions in American courts, we would have difficulty in concluding that their custody should be continued. Unless the Government can satisfy us that it relied to its detriment upon the petitioners' agreement, we see no purpose served in closing our doors to their due process claims. Moreover, in view of our holding that petitioners acquired a right of access to a United States court once they were transferred to American custody, we believe their acceptance of the jurisdictional condition can be sustained only if voluntary and intelligent. See Brady, supra, 397 U.S. at 748, 90 S.Ct. at 1468. We shall consider, therefore, whether the petitioners voluntarily and intelligently agreed to challenge their convictions solely in Mexican courts, and whether the United States advances a sufficiently important interest in holding these prisoners to their bargain.
 
 
 64
 As with petitioners' consents, we believe Jackson, supra, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138, and Alford, supra, 400 U.S. 25, 91 S.Ct. at 162, state the governing principles for determining the voluntariness and intelligence of their agreements. Viewed in the light of the alternatives available to them, Alford, supra, 400 U.S. at 37-38, 91 S.Ct. at 167, we find petitioners' decisions to promise to abide by the Treaty's limitation upon their right to seek relief to have been both informed and intelligent. If, as we have said, they had insisted upon their right, once held in federal custody, to seek review of their Mexican convictions in a United States court, neither the United States nor Mexico would have consented to their transfers. If, however, they agreed to abide by the limitations of the Treaty, petitioners could escape the brutal conditions of Mexican confinement, acquire a hitherto unenjoyed right to parole, and have virtually the same opportunity to challenge their Mexican convictions in Mexico's courts as they previously enjoyed. In addition, petitioners would gain access to United States courts for all claims unrelated to their convictions or sentences.
 
 
 65
 Although petitioners' decisions to accept the jurisdictional condition to their transfer thus appear to be intelligent choices among the available alternatives, Alford, supra, 400 U.S. at 38, 91 S.Ct. at 167, it is less certain that their decisions may be termed "voluntary" within the meaning of Jackson, supra, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138. Arguably, the choice between sacrifice of a right to seek judicial redress from a United States court once repatriated, and continued imprisonment in Mexico, "needlessly penalize(d)" the prisoners' constitutional right to a federal forum once they were placed in United States custody. Id. at 583, 88 S.Ct. at 1217. We are satisfied, however, that the congressional decision to require offenders transferring to American custody to agree to abide by the jurisdictional provision was neither needless nor arbitrary. Moreover, we believe the conditional requirement that prisoners agree to challenge their convictions solely in the courts of the transferring nation legitimately serves two important interests that can be vindicated only by holding these prisoners to their agreements.
 
 
 66
 In assessing the interacting interests of the United States and foreign nations, "we must move with the circumspection appropriate when (a court) is adjudicating issues inevitably entangled in the conduct of our international relations." Romero v. International Terminal Operating Co., 358 U.S. 354, 383, 79 S.Ct. 468, 486, 3 L.Ed.2d 368 (1959). Since Mexico was unwilling to enter a treaty that provided for review of its criminal judgments by United States courts,[43] American negotiators did not have a completely free hand in structuring the Treaty's terms. Guided throughout by their humane concern to ameliorate the plight of hundreds of United States citizens imprisoned in Mexico, the negotiators obviously extracted a significant number of important concessions.[44] At the same time, however, our negotiators were anxious to improve relations with Mexico and hopefully eliminate what had become an important source of tension between the two nations. See Letter from President Carter to the Senate of the United States (Feb. 15, 1977), reprinted in S.Exec.Doc.D., 95th Cong. 1st Sess. 1 (1977).
 
 
 67
 Of paramount importance, however, is the interest of those Americans currently incarcerated in Mexico. Whatever hope the Treaty extends of escaping the harsh realities of confinement abroad will be dashed for hundreds of Americans[45] if we permit these three petitioners to rescind their agreement to limit their attacks upon their convictions to Mexico's courts. We refuse to scuttle the one certain opportunity open to Americans incarcerated abroad to return home, an opportunity, we note, the benefit of which Caban, Velez, and Rosado have already received. In holding these petitioners to their bargain, we by no means condone the shockingly brutal treatment to which they fell prey. Rather, we hold open the door for others similarly victimized to escape their torment.
 
 
 68
 The judgment of the district court is reversed.
 
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 The sentences were ultimately reduced to eight years and nine months following an appeal in Mexico
 
 
 [2]
 Treaty on the Execution of Penal Sentences, Nov. 25, 1976, United States-Mexico, T.I.A.S. No. 8718, reprinted in S.Exec.Doc.D., 95th Cong., 1st Sess. (1977)
 
 
 [3]
 Id. art. IV, para. 2; art. V, para. 1; 18 U.S.C. § 3244(5)
 
 
 [4]
 18 U.S.C. § 3244(5) confers jurisdiction upon the district court of the district in which a transferring prisoner is confined to hear any challenge to the validity or legality of the offender's transfer
 
 
 [5]
 28 U.S.C. § 2241 confers jurisdiction upon the Supreme Court, any justice thereof, the district courts, and any circuit judge within their respective jurisdictions to grant writs of habeas corpus to prisoners who, inter alia, are held in custody in violation of the Constitution or laws or treaties of the United States
 
 
 [6]
 18 U.S.C. § 3244(1) confers upon the country in which a transferring prisoner was convicted exclusive jurisdiction over proceedings seeking to challenge, modify, or set aside the prisoner's conviction or sentence
 
 
 [7]
 With the court's approval, the parties stipulated that the testimony of Caban and Rosado concerning the conditions of their interrogation and confinement in Mexico would apply to Velez as well
 
 
 [8]
 In addition, the court heard testimony from Carlos Mercado, another American imprisoned in Mexico who had transferred to United States custody. Mercado also petitioned the court for a writ of habeas corpus, but withdrew his petition to avoid any risk of return to Mexico. See 18 U.S.C. § 4114
 
 
 [9]
 Because Melendez died prior to the court's decision, Judge Daly dismissed his petition as moot. In addition, although Caban, Velez, and Rosado had each been released on parole prior to the decision, the district court evidently concluded that they remained in "custody" for purposes of habeas relief under 18 U.S.C. § 2241. See Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963)
 
 
 [10]
 Subsequently, Judge Daly denied the Government's motion to open the judgment pursuant to Fed.R.Civ.P. 52(b) and 59(a). The Government had sought to introduce previously available testimony to rebut the petitioners' descriptions of Mexican prison conditions, as well as testimony by the verifying magistrate in Mexico. It also offered a diplomatic note received from the Mexican Government expressing strong displeasure with Judge Daly's decision, and threatening to suspend future transfers under the Treaty
 
 
 [11]
 At one point, the man in the photograph shown to Caban at the airport was brought into the room in which Caban was being questioned. Asked whether he knew Caban, the man answered that he did not. Immediately, the man was beaten and shocked with an electric prod. Two hours later, he said he could endure no more, and "confessed" knowing Caban. Thereafter, Caban's inquisitors intensified his beatings, insisting that he knew Rodriguez
 
 
 [12]
 In addition to the $2,000 "dormitory fee," privileges such as clothing, better food, or drugs could be purchased on a weekly basis. To ensure prompt payment and encourage the cooperation of prisoners' families, the Commandos regularly beat recalcitrant inmates in the presence of their families on visitors' day
 
 
 [13]
 In one instance, an American prisoner was seized by the Fourth Guard and beaten senseless in front of the other Americans, apparently as a warning that total submissiveness was the code of the prison
 
 
 [14]
 A similar treaty between the United States and Canada was ratified by the Senate two days earlier by a vote of 95 to 0. 123 Cong.Rec. S12, 269 (daily ed. July 19, 1977). See S.Exec.Doc.H., 95th Cong., 1st Sess. (1977)
 
 
 [15]
 Act of Oct. 28, 1977, Pub.L.No. 95-144, 91 Stat. 1212 (codified at 10 U.S.C. § 955, 18 U.S.C. §§ 3006A, 3244, 4100-15)
 
 
 [16]
 Treaty, art. II, para. 1
 
 
 [17]
 Id. para. 4
 
 
 [18]
 Id. paras. 2, 3
 
 
 [19]
 Id. paras. 5, 6
 
 
 [20]
 Id. art. IV, paras. 2, 3; art. V, para. 1. To ensure that a prisoner's consent to transfer is given voluntarily and with full knowledge of its conditions, the implementing legislation enacted by Congress provides for a United States magistrate or citizen specifically designated by a judge of the United States to travel to Mexico and to make all necessary inquiries of the offender to determine whether his consent is given voluntarily and knowingly. 18 U.S.C. § 4108. In addition, the offender may receive the advice of counsel prior to the consent verification proceeding, and those who cannot afford counsel must have counsel appointed for them by the verifying officer. Id. § 4109
 
 
 [21]
 Treaty, art. V, para. 2
 
 
 [22]
 Id. paras. 2, 6; 18 U.S.C. § 3244(5). In their respective reports accompanying the proposed implementing legislation, both the Senate and House Judiciary Committees emphasized that 18 U.S.C. § 3244(5) was intended to permit United States courts to entertain attacks upon the constitutionality of the Treaty and its enabling legislation. See S.Rep.No. 95-435, 95th Cong., 1st Sess. 12-13 (1977); H.R.Rep.No. 95-720, 95th Cong., 1st Sess. 43 (1977), reprinted in (1977) U.S.Code Cong. & Admin.News 3165-66
 
 
 [23]
 Treaty, art. VII
 
 
 [24]
 Id. art. V, para. 6
 
 
 [25]
 Id. art. VI
 
 
 [26]
 See 18 U.S.C. § 3244(1)
 
 
 [27]
 See id. § 4108(b)(1)
 
 
 [28]
 See id. § 4114
 
 
 [29]
 DePalm elected not to transfer to United States custody and instead successfully prosecuted his appeal through the Mexican courts, which ultimately overturned his conviction for lack of evidence
 
 
 [30]
 Of course, in the absence of a treaty or other compact, the courts of one sovereign nation will ordinarily decline to enforce the penal laws and judgments of another. See, e. g., The Antelope, 23 U.S. (10 Wheat.) 66, 123, 6 L.Ed. 408 (1825); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 413-14, 84 S.Ct. 923, 932, 11 L.Ed.2d 804 (1964)
 
 
 [31]
 Although Judge Daly suggested that the petitioners' circumstances were unique, numerous witnesses testified at congressional hearings of similar abuses personally suffered while incarcerated in Mexico. Penal Treaties With Mexico and Canada: Hearings Before the Senate Committee on Foreign Relations, 95th Cong., 1st Sess. 197-98, 220-21, 222-26, 226-30 (1977) (Statements of John Korn, Deborah Friedman, Robert Smith, and Paul DiCaro, former prisoners); Transfer of Offenders and Administration of Foreign Penal Sentences: Hearings Before the Subcommittee on Penitentiaries and Corrections of the Senate Judiciary Committee, 95th Cong., 1st Sess. 253-62 (1977) (Statement of Dwight Worker, former prisoner). In addition, more than a few transferring prisoners have filed habeas petitions alleging abuses strikingly similar to those of petitioners. See, e. g., Pfeifer v. United States Bureau of Prisons, 468 F.Supp. 920 (S.D.Cal.1979), aff'd, 615 F.2d 873 (9th Cir. 1980) (torture with electric cattle prod and confession coerced by threat of death); Mitchell v. United States, 483 F.Supp. 291 (E.D.Wis.1980) (beatings and torture with electric cattle prod); Orozco v. United States Bureau of Prisons, No. CV78-2485 (C.D.Cal. Oct. 24, 1979) (beatings and torture); Ruiz v. Bell, No. 79-16 (M.D.Pa. June 29, 1979) (torture with electric cattle prod). In each case, the petition has been denied
 
 
 [32]
 Under Mexican law, drug offenders are ineligible for parole. Accordingly, the petitioners' consents to transfer provided a significant opportunity to shorten the length of their incarceration as well as the other obvious benefits
 
 
 [33]
 It may be argued that Alford rests upon the availability of a judicial inquiry into the factual basis for a defendant's guilty plea. North Carolina v. Alford, 400 U.S. 25, 38 n. 10, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Since the Treaty and implementing legislation seek to preclude any examination of the transferring prisoner's guilt or innocence by United States courts, the argument goes, an essential ingredient is missing. But such a reading of Alford loses sight of the forest for the trees. In Alford the defendant chose between entering a guilty plea and receiving a limited sentence, or putting the state to its proof and running a risk of the death penalty. Before permitting judicial acceptance of either alternative, the Court required the judge who received the plea to determine whether the choice was an intelligent one, that is, whether there was indeed a legitimate reason for the defendant to prefer to avoid the risk of trial. Id. at 37-38, 91 S.Ct. at 167. Inquiry into the factual basis for the plea was thus necessary to determine if the defendant intelligently selected from among the available alternatives. If the evidence of guilt had been slight, however, and the defendant consistently maintained his innocence, the possibility of conviction and a death sentence would have been significantly diminished. Consequently, a plea of guilty in such circumstances would most likely be viewed as an unintelligent alternative
 In the case of transferring prisoners, however, protestations of innocence are simply irrelevant to the intelligence of an offender's choice between incarceration in Mexico or in the United States.
 
 
 [34]
 The principal exception being the reservation to Mexico of jurisdiction over challenges to the prisoners' conviction or sentence. Treaty, art. VI; 18 U.S.C. § 3244(1)
 
 
 [35]
 In a concurring opinion, Justice Douglas poignantly questioned whether the Court would apply the same rule to American citizens held in custody by United States officials pursuant to judgments entered in a foreign tribunal. Hirota v. MacArthur, 338 U.S. 197, 201-02, 69 S.Ct. 197, 198, 93 L.Ed. 1902 (1948)
 
 
 [36]
 The Government questions whether we possess the requisite jurisdiction to grant writs of habeas corpus to these petitioners. Pursuant to 28 U.S.C. § 2241, the judges of the courts of appeals and the district courts are given jurisdiction to grant writs of habeas corpus to petitioners held in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2241(c)(3). Nonetheless, the Government argues that 18 U.S.C. § 3244(1) removes whatever jurisdiction we may possess to grant these petitioners habeas relief. In view of the considerable doubt within Congress over the constitutionality of § 3244's closure of the federal courts to claims such as petitioners', see, e. g., S.Rep. No. 95-435, 95th Cong., 1st Sess. 12-13 (1977); 123 Cong.Rec. S12, 549-50 (daily ed. July 21, 1977) (statement of Sen. Griffin), we do not believe Congress intended to deny petitioners the privilege of the writ of habeas corpus in cases where, as here, they have received no process whatsoever. Indeed, the House Judiciary Committee specifically disclaimed any intent to suspend the writ in its report to the House on the implementing legislation. H.R.Rep.No. 95-720, 95th Cong., 1st Sess. 41 (1977)
 
 
 [37]
 See, e. g., Penal Treaties with Mexico and Canada: Hearings Before the Senate Foreign Relations Committee, 95th Cong., 1st Sess. 90-94, 168-71 (1977) (statements of Prof. Wechsler and Richard Petree) (hereinafter cited as Senate Foreign Relations Hearings )
 
 
 [38]
 See note 20 supra
 
 
 [39]
 Treaty, art. IV, para. 9; art. V, para. 5
 
 
 [40]
 Id. para. 2
 
 
 [41]
 Id. art. I, para. 1; art. VI
 
 
 [42]
 Id. art. IV, para. 2; art. V, para. 1. See also 18 U.S.C. § 4108(b)(1)
 
 
 [43]
 Senate Foreign Relations Hearings 46 (Remarks of Herbert Hansell, Legal Advisor, Department of State)
 
 
 [44]
 For example, transferring prisoners' eligibility for parole is governed by United States law. Treaty, art. V, para. 2
 
 
 [45]
 As of March 28, 1980, 226 Americans were incarcerated in Mexico. Since ratification of the Treaty, 451 Americans have transferred to United States custody. Of this number, only 45 are still incarcerated in the United States. Letter of Richard Blumenthal, United States Attorney, to the Clerk of the United States Court of Appeals for the Second Circuit (Mar. 28, 1980)
 In addition to the treaties with Mexico and Canada, the Senate has approved a similar treaty with Bolivia, and treaties with Panama, Peru, and Turkey have been approved for ratification by the Senate, but have not yet become effective. Each of these treaties contains a provision similar to Article VI of the Mexican Treaty, conferring exclusive jurisdiction over challenges to convictions and sentences to the courts of the transferring nation. See, e. g. Treaty on the Execution of Penal Sentences, Feb. 10, 1978, United States-Bolivia, T.I.A.S. 9219, reprinted in S.Exec.Doc.G., 95th Cong., 2d Sess. (1978).